## BARNES, Etc. v. STATE, Ex Rel. PINKNEY

[No. 163, September Term, 1964.]

566

*Decided, per curiam, October 15, 1964.*
*Opinion filed November 17, 1964.*

The cause was argued before HENDERSON, C. J., and PRES-COTT, MARBURY, SYBERT and OPPENHEIMER, JJ.

*C. Maurice Weidemeyer,* with whom were *Alfred Avins* and *Sam S. Crutchfield, Jr.,* on the brief, for the appellant.

*Mathias J. DeVito, Assistant Attorney General,* with whom were *Thomas B. Finan, Attorney General, Stuart H. Rome, Assistant Attorney General,* and *Marvin H. Anderson, State's Attorney for Anne Arundel County,* on the brief, for the appellee.

OPPENHEIMER, J., delivered the opinion of the Court.

After argument, we affirmed by per curiam order the decree of the Circuit Court for Anne Arundel County which enjoined the appellant from refusing to any person the accommodations of the restaurant owned and operated by him in the City of Annapolis on account of race, color, creed or national origin. The injunction was issued pursuant to the provisions of Code (1964 Supp.), Article 49B, Sections 11 and 12—the 1963 public accommodations law. In affirming the decree, we held that law to be in effect and constitutional. The reasons for our order follow.

This action was brought upon a complaint lodged against the appellant by the Commission on Interracial Problems and Relations under the 1963 public accommodations law. The complainant was a Negro whom the appellant had refused to serve in his restaurant because of the complainant's race. The appellant elected to have the complaint submitted directly to the Circuit Court for Anne Arundel County rather than to have it heard by the Commission in the first instance. He admits the discrimination, but contends that the law was suspended by petitions for a referendum, and that the Secretary of State acted illegally in refusing to give effect to the petitions. The appellant argues that the statutory provisions pertaining to requirements with respect to signatures for a referendum are in conflict with the provisions of the Maryland Constitution; that the Secretary of State did not have the power or authority to decline to accept referendum petitions against the public accommodations law on the ground of the invalidity of some of the signatures and should have referred the petitions to the elec-

torate; and that therefore the public accommodations law has never gone into effect. He also contends that the provisions of that law are in violation of the Involuntary Servitude provision of the Thirteenth Amendment and of the Privileges and Immunities and Due Process clauses of the Fourteenth Amendment of the Constitution of the United States.

The State contests the right of the appellant in these proceedings to challenge the legality of the Secretary's refusal to place the public accommodations law on the ballot. It urges that the only proper manner in which this question could have been raised was by a mandamus action, rather than by a collateral attack in enforcement proceedings. The State also contends that any right the appellant might have to contest the Secretary's action is barred by laches. We do not decide these questions, for, in our opinion, even assuming the appellant has the right to contest the Secretary of State's action, his contentions with respect to both the Maryland and Federal Constitutional provisions are without merit.

I

Article XVI of the Maryland Constitution reserves to the people the power of referendum, to approve or reject at the polls any Act of the General Assembly if approved by the Governor or if passed over the Governor's veto.[1] Section 1(b) reads as follows:

> "(b) The provisions of this Article shall be self-executing; provided that additional legislation in furtherance thereof and not in conflict therewith may be enacted."

Section 2 provides that if a referendum petition is filed with the Secretary of State, "the same shall be referred" by him to a vote of the people at the next ensuing election. Section 3 deals with the number of signers necessary for a referendum petition, and for extending the time for filing the petition for thirty days if more than one-half the requisite number of signatures required are appended before the first day of June. Section 4 reads as follows:

---

1. For the extent of the adoption of the referendum, see note, 43 Harv. L. Rev. 813 (1930).

"A petition may consist of several papers, but each paper shall contain the full text of the Act or part of Act petitioned upon; and there shall be attached to each such paper an affidavit of the person procuring the signatures thereon that of the said person's own personal knowledge every signature thereon is genuine and bona fide, and that the signers are registered voters of the State of Maryland, and of the City of Baltimore, or County, as the case may be, as set opposite their names, and no other verification shall be required."

The statutory provisions in respect of signatures to referendum petitions are contained in Section 169 of Article 33 of the Code (1964 Supp.). This Section was originally enacted in 1941 (Chapter 335, § 315A), and was re-enacted in 1957, with some changes not here material. In 1962, the section was amended to read as follows:

"In every petition (including an associated or related set of petitions) under the provisions of Article XVI of the State Constitution, there shall be appended to the signature of each signer his residence, the precinct or district wherein he is registered as a voter, and immediately below the signature of any such signer, there shall be either printed or typed, the name of such signer." Code (1964 Supp.).

The amendment added the phrase in parentheses; otherwise the provisions of the 1957 law were re-enacted without change. The 1962 session of the General Assembly added Sections 169A to E, inclusive. Sections 169A and B make it unlawful to obtain signatures by misrepresentation or knowingly to circulate false statements or representations concerning the contents or purpose of a petition to obtain any signature thereto. Section 169B-(e) makes it unlawful "[t]o give, pay, or receive any money or other valuable consideration or inducement for signing the petition or for securing signatures thereon"; and Section 169C provides for the filing of statements of contributions and expenditures with the petition. Section 169D states that any ques-

tion concerning the invalidity of the signature of any person affects that signature only. Section 169E, provides that offenses under the preceding sections shall be punishable as an offense under the election laws and, if the offense warrants, .shall also be punishable under the laws concerning perjury.

The public accommodations law was enacted by Chapters 227 and 228 of the 1963 session of the Legislature.[2] Prior to June 1, 1963, the date on which that law was to become effective, referendum petitions were filed to place both chapters of the law to a vote at the next general election. The Secretary of State examined the petitions, and in doing so applied the standards and requirements of both Section 4 of Article XVI of the Maryland Constitution and Section 169 of Article 33 of the Code. The Secretary rejected a number of signatures which left the first half of each referendum petition short of the required number, and refused to place the 1963 law on the ballot. If the Secretary had applied only the Constitutional limitations and not those contained in Section 169, each petition, upon its face, would have sufficed.

If the requirements of Section 169 of Article 33 relating to the form of signatures contained in referendum petitions are valid, the referendum petitions were insufficient to suspend the law and refer the bills. If the provisions of Section 169 of Article 33 are inconsistent with the provisions of the Maryland Constitution and therefore invalid, the law should have been referred.

The only provision of Section 4 of Article XVI of the Maryland Constitution as to the form of the petition is that it may consist of several papers, each of which shall contain the full text of the Act or part of the Act petitioned upon. The requirement of an affidavit from the person procuring the signatures does not go to the form of the petition to which the affidavit is to be attached. In *Sun Cab Co. v. Cloud*, 162 Md. 419, 159 Atl. 922 (1932), nine years before the enactment of Section 169

2. The 1963 Act applies only to Baltimore City and some of the counties. In 1964, the public accommodations law was made State-wide. The 1964 Act was approved in a referendum vote on November 3, 1964.

of Article 33, Chief Judge Bond, in delivering the opinion of the Court, said:

> "Each form of petition signed must contain the affidavit of the person procuring the signature, that of his own personal knowledge each signature is genuine and *bona fide,* and that the signers are registered voters of the State, and of the city or county, as the case may be, set opposite their respective names. How it shall be ascertained whether these constitutional requirements have been met by petitions filed, the referendum article has not prescribed." 162 Md. at 422.

The present section adds three requirements to the form of the petition. The residence of each signer and the precinct or district wherein he is registered as a voter must be appended to his signature, and below his signature his name must be either printed or typed.

These statutory requirements pertain only to the identification of the signer. They do not affect the Constitutional provision with respect to the affidavit of the person who procured the signatures, except insofar as they may provide means of checking the truth of the affidavit. They do not require further affidavits. Section 4 of the Constitutional provision "that no other verification shall be required" must be taken in conjunction with the provisions of Section 1(b). Clearly, the provisions of the Article will be furthered if, by proper and reasonable means, a referendum petition is to be put upon the ballot only if it has the requisite number of genuine signatures of registered voters. We hold that the statutory provisions are not in conflict with Section 4 of Article XVI of the Constitution. We hold, further, that these provisions are reasonable and constitute proper legislative enactments in furtherance of and not in conflict with the purposes of the Article.

The requirements that the residence of each signer and the precinct or district in which he is a registered voter must be appended to his signature are only proper means to endeavor to assure that the provisions of the Constitution as to who may sign referendum petitions are met. They safeguard the privilege which the Constitution grants. They facilitate checking of

the petitions by interested persons to ensure that only qualified persons have signed. Similar provisions have been upheld as reasonable in other jurisdictions. *Shields v. Wells,* 65 S. D. 552, 276 N. W. 246 (1937) ; *State, ex rel. Jensen v. Wells,* 66 S. D. 236, 281 N. W. 99 (1938) ; *Headley v. Ostroot,* 76 S. D. 246, 76 N. W. 2d 474 (1956) ; *Dawson v. Meier,* 78 N. W. 2d 420 (N. D. Sup. Ct. 1956) ; *Mayock v. Kerr,* 216 Cal. 171, 13 P. 2d 717 (1932).

The requirement that the name of the signer is to be printed or typed below his signature falls within the same category. We take judicial notice of the fact that many signatures are illegible. The Legislature has enacted a similar provision with respect to the recording of deeds and other legal instruments. Code (1957) Article 17, Section 52.

In a comprehensive opinion in the Baltimore City Court, Judge Tucker upheld as reasonable and constitutional the statutory provisions here involved, as well as other provisions in the law then in effect which required the appending of the signer's occupation and place of business. *Reddick v. State,* reported in 42 Ops. Att'y Gen. 495 (1958). As to the requirement that the signer's name be printed or typed on the petition, Judge Tucker said:

> "Then, there is the provision that the signer's name shall be printed or typed on the petition. The purpose of that is, probably, because the handwriting of a lot of people who sign a petition is really illegible. It is not going to help the Secretary of State to find out whether a particular person is a registered voter if he does not know his name. I have glanced over some of these petitions, and some of the signers wrote their names very legibly. There are others which are difficult, if not impossible, to decipher; and this requirement has a good purpose."

In *State, ex rel. Ayres v. Amsberry,* 104 Neb. 273, 177 N. W. 179 (1920), relied upon by the appellant, the court held unreasonable and invalid a Nebraska statute which required a copy of the law sought to be referred to be attached to each sheet of signatures. In Maryland, the decision is not apposite;

that requirement is contained in our Constitution. The appellant cites language from the *Amsberry* case and other authorities to the effect that legislation to implement the referendum provisions of the Constitution must be reasonable and must not place any undue burden on the exercise of that constitutional right. We agree. The legislation before us complies with these conditions.

The appellant also contends that Section 169B(e) of Article 33, making it unlawful to give or receive money or other consideration for signing a petition or securing signatures is an unlawful restriction of the people's right to a referendum; that Chapter 43 of the 1962 Laws containing this provision and the other provisions as to referendum petitions has no severability clause, and therefore this entire Chapter is inoperative; and that, for these reasons, the action of the Secretary of State in refusing to put the referendum on the ballot was illegal and the operation of the public accommodations law is still suspended. We disagree with his conclusion and with each of the postulates upon which it is based.

Sections 169A to E, inclusive, are not requirements as to the sufficiency of referendum petitions but only collateral measures to prevent fraud, similar to the corrupt practices provisions in connection with the election laws to which they refer. See Pettengill, *Regulation of Campaign Finance—The Maryland Experience,* 19 Md. L. Rev. 91 (1959). The appellant has proffered no argument or authority to overcome the presumption of the constitutionality of Sections 169A through E,[3] except as to Section 169C. The appellant cites *State, ex rel. v. Snell,* 168 Ore. 153, 121 P. 2d 930 (1942) as authority that the provisions of Section 169C, requiring the filing of a statement of contributions and expenditures with a referendum petition, are unreasonable and invalid. In that case, however, the

---

3. On the constitutionality of corrupt practices acts in general, see Ann. 69 A.L.R. 377.

We do not decide the constitutionality of a criminal statute in advance of its application to a particular person claimed to be injured and without reference to the precise facts to which it is to be applied. *Hammond v. Lancaster,* 194 Md. 462, 471-73, 71 A. 2d 174 (1950).

court only held there had been an unnecessarily narrow construction of the statute and that the statute had been substantially complied with. Even were Section 169A through E invalid, the remainder of the Chapter, Section 169, would not necessarily fall. It is the legislative intent, not the absence of a severability clause, which is controlling; such a clause is not indispensible if the requisite intent, as here, may be otherwise found. *McKeldin v. Steedman*, 203 Md. 89, 103-04, 98 A. 2d 561 (1953). However, if the appellant prevailed on all his other contentions on this point, he would be no better off in this case, for the effect of the invalidity of the 1962 law would only be to relegate him to the 1957 statute, the provisions of which, as to the requirements for a referendum petition, are virtually the same.

The appellant argues that even if Section 169 of Article 33 is constitutional, its requirements in respect of the contents of referendum petitions are merely directory and not mandatory, so that the ruling of the Secretary of State that there were an insufficient number of valid signatures on the referendum petitions was nugatory. Section 169 provides that each signature on a referendum petition "shall" (not "may") be supported by a statement of the signer's residence and voting precinct or district and by his name in print or type. The use of the words "shall" or "may" is not controlling in determining whether a particular provision is mandatory or directory; the question of construction turns upon the intention of the Legislature as gathered from the nature of the subject matter and the purposes of the legislation. *Hitchins v. City of Cumberland*, 215 Md. 315, 323, 138 A. 2d 359 (1958). However, the word "shall" of itself demonstrates a mandatory intent unless the context indicates otherwise. 2 Sutherland, *Statutory Construction*, § 2803, (3d ed. 1943); Crawford, *Statutory Construction*, § 262 (1940). Here the context supports rather than negatives the mandatory intent of the statutory provision. Section 169 is clearly designed to provide additional means by which fraudulent or otherwise improper signatures upon a referendum petition may be detected. If the provisions of the section were only directory, laws enacted by the Legislature could be suspended, even if the Secretary of State had found that the ref-

erendum petition lacked the necessary number of valid signatures. Courts in other jurisdictions have held that similar statutory provisions are mandatory rather than directory. *Associated Industries v. Oklahoma Tax Commission,* 176 Okla. 120, 55 P. 2d 79 (1936); *Ford v. Mitchell,* 103 Mont. 99, 61 P. 2d 815 (1936); *State, ex rel. Winter v. Swanson,* 138 Neb. 597, 294 N. W. 200 (1940).

The appellant further contends that, even if there were an insufficient number of valid signatures on the referendum petitions and the Secretary of State so found, the filing of the petition of itself suspended the law, unless and until it was judicially determined that the valid signatures on the petitions were insufficient. To support his argument, he relies upon a phrase in the opinion in *First Continental v. Director,* 229 Md. 293, 301, 183 A. 2d 347 (1962), that "only a court can effectively hold that an attempted referral is fatally faulty." The phrase quoted, however, must be considered in the context of the issue there before us. That case involved the validity of an appointment of a receiver for a savings and loan association. Petitions for a referendum on one of the bills passed by the Legislature with reference to building and loan associations had been filed with signatures sufficient in number to effect suspension of the Act until the next election. Shortly thereafter, a bill was passed and approved at a special session of the Legislature, identical in substance with the bill against which the referendum petitions had been filed, except with respect to the administration of the law. The Attorney General ruled that there had been an insufficient number of valid signatures on the referendum petitions presented to the Secretary of State and formally advised the Secretary to that effect. The appellant argued that, because of this action of the Attorney General, the Act on which a referendum was sought had not been suspended but was in effect at the time and that therefore the Act passed at the special session of the General Assembly pursuant to which the receiver had been appointed, was not in effect by its own terms. We disagreed with this conclusion and affirmed the order appointing the receiver. We held that the views of the Attorney General as to compliance with the requirements of Article XVI of the Constitution are advisory only

and cannot operate to terminate the suspension of a referred law any more than the Attorney General's opinion that a law is unconstitutional makes that law inoperative. It was in connection with this holding that we used the phrase upon which the appellant here relies. Our decision in the *First Continental* case did not go to the legal power of the Secretary of State to refuse to suspend the operation of a law because the number of valid signatures to the referendum petition is insufficient, but only to the lack of power of the Attorney General to terminate the suspension. It is the Secretary of State, not the Attorney General, with whom a referendum petition must be filed. Our holding on this aspect of the case was only that, once the Secretary of State has accepted a referendum petition as valid and thereby suspended the operation of the act until the election, the Attorney General has no legal power to resuscitate the statute. In the present case, it is the Secretary of State, the official designated in the Constitution to receive a referendum petition, who found the petitions to be fatally defective. The *First Continental* case therefore is not here applicable.

## II

The public accommodations law is a valid exercise of the police power of the State and does not violate any of the appellant's rights under the Privileges and Immunities and Due Process clauses of the Fourteenth Amendment. The law prohibits discrimination because of race, creed, color or national origin of any person by the owner or operator of a place of public accommodation. A place of public accommodation is defined to mean any hotel, restaurant, inn, motel or an establishment regularly engaged in the business of providing sleeping accommodations or serving food or both for a consideration, and which is open to the general public, with certain exceptions as to places or portions of premises primarily devoted to the sale of alcoholic beverages. The appellant concedes, as under the authorities he must, that at common law, inns and common carriers were under a duty not to discriminate. What the Legislature has done in the public accommodations law is to extend that duty to carefully limited places of public accommodations which, while not public utilities, like them, are open to the gen-

eral public for the supplying of necessities. Such an extension is within the legislative discretion, under the police power, to determine what measures are necessary or appropriate for the protection of the health, morals or welfare of the people. The courts will not interfere with the exercise of that power, if the regulation is not arbitrary, oppressive or unreasonable, even though its exercise may inconvenience individual citizens. See *Davis v. State*, 183 Md. 385, 396-98, 37 A. 2d 880 (1944).

Anti-discrimination laws similar to or even broader than the Maryland public accommodations law have been generally sustained as a proper exercise of the police power. *Marshall v. Kansas City*, 355 S. W. 2d 877 (Sup. Ct. Mo. 1962) ; *Levitt & Sons, Inc. v. State Div. Against Discrim., etc.*, 31 N. J. 514, 158 A. 2d 177 (1960) ; *Burks v. Poppy Construction Co.*, 57 Cal. 2d 463, 370 P. 2d 313 (1962) ; *Pickett v. Kuchan*, 323 Ill. 138, 153 N. E. 667 (1926) ; *District of Columbia v. Thompson Co.*, 346 U. S. 100 (1953) ; Ann. 49 A.L.R. 505, and cases therein cited.

Maryland's right to pass the public accommodations law is not contravened by the Fourteenth Amendment. *Marshall v. Kansas City, supra; Pickett v. Kuchan, supra; People v. King*, 110 N. Y. 418, 18 N. E. 245 (1888). See *Western Turf Association v. Greenberg*, 204 U. S. 359 (1907). In *Railway Mail Assn. v. Corsi*, 326 U. S. 88 (1945) the Supreme Court unanimously upheld the constitutionality of the New York Civil Rights Law forbidding any "labor organization" to deny any person membership by reason of his race, color or creed. The words of Justice Frankfurter, in his concurring opinion, apply to the claim made by the appellant that the public accommodations law violates his rights under the Fourteenth Amendment:

> "Elaborately to argue against this contention is to dignify a claim devoid of constitutional substance. Of course a State may leave abstention from such discriminations to the conscience of individuals. On the other hand, a State may choose to put its authority behind one of the cherished aims of American feeling by forbidding indulgence in racial or religious prejudice

to another's hurt. To use the Fourteenth Amendment as a sword against such State power would stultify that Amendment. Certainly the insistence by individuals on their private prejudices as to race, color or creed, in relations like those now before us, ought not to have a higher constitutional sanction than the determination of a State to extend the area of nondiscrimination beyond that which the Constitution itself exacts." 326 U. S. at 98.

The appellant argues that the public accommodations law is unconstitutional because restaurants do not enjoy a monopoly. This argument goes only to whether or not the Thirteenth and Fourteenth Amendments of themselves prohibit discrimination. That question is not before us. We hold only that the public accommodations law is a valid exercise of the State's police power and that the law is not in violation of the Federal Constitution.

The appellant's argument that the law is invalid under the Thirteenth Amendment is equally unsubstantial. The restriction placed upon the conduct of his business is not involuntary servitude under the meaning of that Amendment. See *United States v. Petrillo,* 332 U. S. 1 (1947) and *Marcus Brown Co. v. Feldman,* 256 U. S. 170 (1921). The duty not to discriminate which the Legislature has imposed upon restaurants such as the one which the appellant owns is a condition of his carrying on that business, not a requirement that he stay in it. Like the inn-keepers whom he admits could not discriminate at common law, if the appellant feels the condition too onerous, he is under no obligation to continue in an occupation lawfully regulated in the public interest.