MARYLAND MEDICAL SERVICE, INC. *v.*
CARVER, ET AL.

[No. 245, September Term, 1964.]

468

470

*Decided April 30, 1965.*

The cause was argued before HAMMOND, HORNEY, MAR-BURY, OPPENHEIMER and BARNES, JJ.

*F. M. Gloth, Jr.,* with whom were *Hilary W. Gans* and *Joseph T. Brennan, 2d* on the brief, for appellant.

*Reuben Shiling,* with whom were *Gordon E. Miller* and *Hugo Ricciuti* on the brief, for appellees.

BARNES, J., delivered the opinion of the Court.

This appeal involves the construction of the Act of 1963, Chapter 548, which amended the non-profit health plan sec-

tions of Article 48A of the Code in regard to insurance, now codified as Sections 354 to 361, to provide for chiropodial care rendered by chiropodists under these plans. By the 1963 amendment the words "chiropodist" and "chiropodial" were inserted in appropriate places in the existing statutes and to Section 355(b) (2) were added the words:

"and that each subscriber shall be entitled to reimbursement for any such chiropodial service, whether the said service is performed by a doctor of medicine or duly licensed chiropodist."

The basic question in the case is whether the provisions of the 1963 amendment are permissive or mandatory. In a declaratory judgment proceeding brought by two certificate holders of the Blue Shield Plan and by two chiropodists, in the Circuit Court for Baltimore County, Judge Raine held that the proper construction of the 1963 amendment was that it was mandatory and entered a decree carrying that decision into effect, but provided in the decree that the two certificate holders were not entitled to reimbursement for services rendered by chiropodists under their existing Blue Shield contracts. The operator of the Blue Shield Plan has appealed from the decree declaring that the existing Blue Shield contracts do not comply with the requirements of Code, Art. 48A, Sec. 355(b) and the certificate holders have filed a cross appeal from the portion of the decree which provides that they are not entitled to reimbursement under their existing certificates.

The Insurance Commissioner who was also a party defendant in the lower court, has not entered an appeal from the decree.

The appellant, Maryland Medical Service, Inc. (Blue Shield) is a Maryland corporation without capital stock organized in 1950 to establish, operate and maintain a non-profit health service plan authorized by the Acts of 1945, Chapter 752, Sections 235 to 242, now as amended, Code, Art. 48A, Secs. 354 to 361. The non-profit health service plan established and operated by Blue Shield is known as the Maryland Blue Shield Plan (Blue Shield Plan).

The original by-laws of Blue Shield indicate that it was

formed under the auspices of the Council of the Medical and Chirurgical Faculty of Maryland and the Director of the Maryland Hospital Service, Inc., the operator of a non-profit plan for rendition of hospital services (Blue Cross), also incorporated under Art. 48A of the Code.

Following its incorporation and the adoption of its by-laws, Blue Shield entered into agreements with eligible physicians in Maryland (participating physicians) and adopted a Participating Physician's Manual (Physician's Manual) setting forth the monetary benefits which would be allowed subscribers for specified services rendered by participating physicians, or by non-participating physicians. If the specified services were rendered by a participating physician the payments for those services were made directly to that physician by Blue Shield; if the services were rendered by a non-participating physician, Blue Shield made the payments directly to the subscriber.

In the Physician's Manual, it is stated, *inter alia,* that:

"Subject to express provisions of law, there shall be free choice by the patient of any duly licensed physician practicing in the area served by the Plan."

Under the heading "Participating Physicians" appears the following:

"Participating Physicians agree to accept the benefits provided by Blue Shield as *full payment for services* rendered a subscriber whose income classification makes him eligible for 'service benefits' (see section following).

"Inherent in the basic Blue Shield concept is the right of *every licensed physician* in Maryland to participate in the Plan, and *the right of the patient to select his physician.* The doctor-patient relationship is not encroached upon; simply, the Plan rather than the patient pays the fee. Just as the Plan does not interfere with the patient's choice of physician, it imposes no restrictions on the physician's method of diagnosis or treatment." (Emphasis supplied).

Under the heading "Service Benefit Provisions" the Physician's Manual provides:

"Under the terms of this participation agreement, a Participating Physician agrees to accept as payment in full the Blue Shield benefits for covered services to subscribers whose annual incomes do not exceed stipulated amounts. If the subscriber's *income is in excess of these limits,* the physician may bill the subscriber for the difference, if any, between his usual fee for the services provided and the Blue Shield benefits. This unique service benefit feature provides many Blue Shield subscribers with paid-in-full protection *while still preserving their complete freedom of choice in the selection of their physicians."* (Emphasis supplied).

Seven areas of benefits are specifically excluded. Among them are:

"(4) Oral surgical services provided by a doctor of dental surgery."

There is no specific exclusion of chiropodial services.

In Section IV, under the heading "Partial Schedule of Blue Shield Benefits" appear three items of coverage relevant to this case. These are:

| | Plan A | Plan B |
|---|---|---|
| "Drainage of infection of nail fold with or without removal of nail." | $ 15.00 | 25.00 |
| "Excision of nail bed or nail fold, partial or complete." | 20.00 | 30.00 |
| "Avulsion of nail" | 10.00 | 15.00 |

It is also provided in the Physician's Manual that when services are reported by a Participating Physician, payment is made directly to him but "when services are reported by a nonparticipating physician, payments are made directly to the subscriber."

Blue Shield issued Membership Certificates to applicants. The certificates involved in this appeal is a "Class A Certificate" issued to the appellees William M. Hinkle and F. A. Bridgers.

These certificates provide specifically that "Service Benefits will not apply to Oral Surgical Services when rendered by a doctor of dental surgery." Under Article IV "Limitations and Exclusions," it is provided:

> "1. The following are not covered by this Subscription Agreement:
> "F. Care of corns, bunions (except capsular or bone surgery therefor), callouses, nails of the feet except radical surgery for ingrown nails, flat feet, fallen arches, weak feet, chronic foot strain or symptomatic complaints of the feet, except when major surgery is performed;"

There is also a provision that where the services are rendered by a non-participating physician "payment for such services shall be made by Blue Shield directly to the subscriber for the charge by the physician in an amount up to but not exceeding the amount specified for such services in the Schedule of Benefits."

The Subscription Agreement may be terminated either by the applicant or by Blue Shield upon giving 30 days prior written notice. The membership certificate contains no provision for renewal. It provides that rights and benefits accrue to a subscriber only during the period for which subscription charges have been accepted by Blue Shield. It further provides that the agreement terminates after the expiration of 30 days from the due date of subscription charges *or* by either Blue Shield or the applicant at any time giving 30 days' prior written notice to the other party.

The appellants Hinkle and Bridgers paid subscription charges subsequent to June 1, 1963 and these charges were accepted by Blue Shield. The form of Membership Certificate appearing in the record was printed after June 1, 1963.

It is undisputed that the appellees, Melvin Carver and Michael M. Sherman were at all relevant times licensed chiropodists pursuant to Code, Art. 43, Secs. 481 to 494, but were not "Physicians" licensed and registered to practice medicine in Maryland. It is also undisputed that Margaret Hinkle, wife of the appellee, William M. Hinkle, received services from the chiropodist Sherman on July 19, 1963 for which a statement of $20.00

was submitted to Blue Cross on August 14, 1963; that Mae Smart Bridgers, wife of the appellee, F. A. Bridgers, received services from the chiropodist Carver on November 7, 1963 for which a statement of $85.00 was submitted to Blue Shield on December 12, 1963. Blue Shield refused both of these claims on the ground that "chiropodial services . . . were not included in the Membership Certificate issued by Blue Shield . . ." Presumably if the services had been rendered by a non-participating physician rather than by chiropodists, the claims would have been within the coverage of the Membership Certificate.

It will be helpful to the decision of the case to review briefly the historical background of the legislation to be construed.

The first statutory authorization in Maryland for this type of plan was by the Act of 1935, Chapter 476, which added ten new sections to Article 1 of the Code of Public Local Laws of Maryland for Allegany County. This statute provided for the organization and operation of non-profit *hospital* service plans. Any proposed non-profit hospital service corporation was required to obtain the approval of the Insurance Commissioner and the Board of State Aid and Charities prior to its incorporation and when incorporated was permitted to enter into a contract with a duly qualified hospital for the rendering of hospital services to its subscribers provided that the rates charged "shall at all times be subject to the approval of the State Insurance Commissioner." There were also provisions for filing annual reports with the Insurance Commissioner or his deputies, for the resolving of disputes and for the investment of funds.

By the Act of 1937, Chapter 224, the ten sections of the Code of Public Local Laws for Allegany County enacted by the Act of 1935, Chapter 476, were repealed and nine new sections were added to Article 48A under a new subtitle "Non-Profit Hospital Service." The new legislation provided for the formation of corporations for establishing, maintaining and operating a Non-Profit Hospital Service Plan "whereby hospital care is provided by a hospital or hospitals to persons who become subscribers . . ." There was provision for a license to be issued by the Insurance Commissioner, a license fee of $100.00, various requirements to be performed by the corporation prior to issuance of a license, with provisions for approval of con-

tracts, rights of visitation and inspection, and revocation of licenses by the Insurance Commissioner. There were also provisions for the filing of annual statements, for the restriction of investment of funds, for exemption from taxation both state and local, and for various penalties for violation of the Act.

There was an important amendment of one section of the public general law by the Act of 1941, Chapter 906, principally in regard to the license fee (reducing it from $100 to $10.00 as provided by then Section 36 of Art. 48A).

A significant change in the law was made by the Act of 1945, Chapter 752. The sub-title in Art. 48A of the 1939 Code (and 1943 Supplement) was changed from "Non-Profit Hospital Service Plans" to "Non-Profit Health Service Plans." In addition to hospital care, the 1945 amendments provided for "medical or dental care" as additional purposes for which the non-profit corporation could operate. The new Sec. 235 included the words "medical or dental care" in addition to "hospital care." This Sec. 235 became Sec. 326 of Art. 48A of the 1957 Code; and is now Sec. 354 of the Code (1964 Supp.). In Sec. 236(2) as amended, it was provided that the Insurance Commissioner before issuing the license and payment of the license fee should be satisfied:

"(2) That each contract executed or proposed to be executed, by the applicant and any hospital, physician or dentist for the furnishing of hospital, medical or dental service to the subscribers to the Health Service Plan obligates, or will, when executed, obligate each hospital, physician or dentist party thereto to render the service to which each subscriber may be entitled under the terms and conditions of the various contracts issued, or proposed to be issued by the applicant to subscribers to the Plan." This Section 236 became Section 327 of Article 48A of the 1957 Code, and is now Code (1964 Supp.) Section 355.

In Section 237 the provisions for care by physicians and dentists in addition to hospital care were added. This Section 237 became Section 328 of Article 48A of the 1957 Code, and is now Code (1964 Supp.) Section 356.

Into this legislative setting, the Act of 1963, Chapter 548 (introduced into the General Assembly of Maryland as Senate Bill

231,) with which we are particularly concerned in this appeal, was enacted. The 1963 Act recites in its title that it is an "Act to repeal and re-enact with amendments, Sections 354, 355 and 356 of Article 48A" of the 1957 Code "amending the laws concerning non-profit health service plans in order that chiropodial care and services may be rendered under contracts made as a part of such non-profit health service plans, and that subscribers under such contracts be entitled to reimbursements for such care and services, whether performed by a doctor of medicine or duly licensed chiropodist."

In the body of the Act, Sections 354, 355 and 356 are amended to add the words "chiropodist" or "chiropodial" where appropriate to have chiropodists or chiropodial services included with hospitals, physicians or dentists or with medical or dental care, as the case may be.

In Section 355(b)(2), however, as we have already indicated, significant additional lines were added so that it read as follows:

> "That each contract executed, or proposed to be executed, by the applicant and any hospital, physician, *chiropodist* or dentist for the furnishing of hospital, medical, *chiropodial* or dental service to the subscribers to the health service plan, obligates, or will when executed, obligate each hospital, physician, *chiropodist* or dentist party thereto to render the service to which each subscriber may be entitled under the terms and conditions of the various contracts issued, or proposed to be issued, by the applicant to subscribers to the plan, *and that each subscriber shall be entitled to reimbursement for any such chiropodial service, whether the said service is performed by a doctor of medicine or duly licensed chiropodist.*" (The emphasis supplied indicates the words added by the 1963 amendment).

The prior decisions of this Court have established the principles which will guide us in construing the Act of 1963, Chapter 548. The cardinal rule of construction of a statute is to discover and to carry out the real legislative intention. *Barnes v.*

*State, ex rel Pinkney,* 236 Md. 564, 574; 204 A. 2d 787, 792 (1962). *Casey Development Corp. v. Montgomery County,* 212 Md. 138, 129 A. 2d 63 (1957). The legislative intent is to be sought in the first instance in the words used in the statute and if there is no ambiguity or obscurity in the language used in the statute, there is usually no need to look elsewhere to ascertain the intent of the legislature. *Board of Supervisors of Election of Baltimore City v. Weiss,* 217 Md. 133, 141 A. 2d 734 (1958). See particularly the comprehensive review of the prior Maryland cases at pages 136 and 137 of 217 Md. If the legislative intent is expressed in clear and unambiguous language, this will be carried into effect by this Court even if this Court might be of the opinion that the policy of the legislation is unwise, or even harsh or unjust, if no constitutional guarantees are impaired by the legislation. *Schmeizl v. Schmeizl,* 186 Md. 371, 46 A. 2d 619 (1946). In construing the words used in the statute, this Court will consider them in their natural and ordinary signification; if, however, the words used in the statute are of doubtful meaning, this Court in determining the legislative intent, will consider not only their usual and literal meaning, but their meaning and effect considered in the light of the objectives and purposes of the enactment and the consequences resulting from one meaning rather than another meaning, with the real legislative intent prevailing over the intent indicated by the literal meaning of the words used. *Height v. State,* 225 Md. 251, 170 A. 2d 212 (1961). This Court should also read all parts and all sections of the sub-title "Non-Profit Health Service Plans" together to arrive at the true intention of the legislature, as these sections form part of a general legislative system governing this subject matter, *Height v. State, supra.*

We have concluded that Judge Raine's construction of the Act of 1963, Chapter 548, was correct, i.e., that by the clear and unambiguous language used the last clause in Section 355-(b)(2) of Article 48A is mandatory, rather than permissive, and *requires* Blue Shield to reimburse its subscribers in contracts entered into subsequent to June 1, 1963 when the Act was effective, for covered services when performed by a chiropodist and not by a physician.

It is provided in the last clause of Section 355(b)(2) that

"each subscriber *shall* be entitled to reimbursement . . ." (Emphasis supplied). Ordinarily the word "shall" is mandatory and it is presumed that the legislature used this word in its usual and natural meaning unless there is something in the legislation to indicate otherwise. In *Barnes v. State, ex rel, Pinkney, supra,* 236 Md. 564, 574-575, 204 A. 2d 787, 792, Judge Oppenheimer speaking for the Court stated:

". . . the word 'shall' of itself demonstrates a mandatory intent unless the context indicates otherwise."

See *Elmer v. Commissioner of Insurance,* 304 Mass. 194, 23 N.E. 2d 95 (1939), in which the Supreme Judicial Court of Massachusetts in construing a statute in regard to the organization of a mutual insurance company to carry on the business of liability, collision and health insurance, construed the word "shall" in the clause providing that the Insurance Commissioner shall enter his approval on the articles "as mandatory and not directory." Mr. Justice Qua, speaking for the Supreme Judicial Court of Massachusetts, stated:

" 'Shall' in a statute is commonly a word of imperative obligation. It is inconsistent with the idea of discretion." [1]

See also *State, ex rel, Tollefson v. Novak,* 7 Wash. 2d 544, 110 P. 2d 636 (1941) and *Creteau v. Phoenix Assurance Co. of N. Y.,* 202 Va. 641, 119 S. E. 2d 336 (1961) ; 42 Op. Atty. Gen. of Md. 303, December 26, 1957 (opinion by Honorable C. Ferdinand Sybert, Attorney General and now a judge of this Court) and 41 Op. Atty. Gen. of Md. 424, July 27, 1956 (opinion by Norman P. Ramsey, Deputy Attorney General).

Our examination of the other sections under the Sub-title "Non-Profit Health Service Plans" not only fails to indicate that the word "shall" was not used in the mandatory sense, but the words used in these sections indicate to us that this word was deliberately used by the legislature in its mandatory sense.

---

1. Elmer v. Commissioner of Insurance was cited with approval and followed in Johnson v. District Attorney for the Northern District, 342 Mass. 212, 172 N.E. 2d 703 (1961).

Throughout the eight sections there is a careful and precise use of the words "shall" and "may" to indicate mandatory and permissive or discretionary purposes, respectively. In Section 354, it is provided that a corporation formed to establish, maintain and operate a non-profit health service plan *"shall* be governed and regulated by the provisions of this subtitle . . . and no law hereafter enacted *shall* apply to such corporations, unless they are expressly designated therein and specifically refer to such corporation." (Emphasis supplied). These provisions are mandatory and not permissive. In Section 355(a), it is provided that no corporation *"shall* issue contracts" (emphasis supplied) until licensed by the Insurance Commissioner. This is mandatory. On the other hand, in Section 355(b)(4) when discretionary power is intended to be conferred, it is stated "and such reserve as the Insurance Commissioner *may* deem adequate." (Emphasis supplied).

Looking at the objectives and purposes of the legislature it appears to us that it was intended by the last clause added to Section 355(b)(2) to give mandatorily to the subscribers, the right of reimbursement for covered chiropodial service whether such service is performed by a doctor of medicine or a duly licensed chiropodist. This policy of freedom of choice is consistent with the policy of Blue Shield in regard to participating and non-participating physicians as expressly indicated in the By-laws and Physician's Manual of Blue Shield. The legislative purpose in adding this clause was to insure this freedom of choice to the subscriber as between physicians and chiropodists, either participating or non-participating. The legislature could reasonably give this freedom of choice to the subscriber in view of the careful and rather stringent State regulations in regard to the licensing of chiropodists as contained in Code, Art. 43, title "Health," Secs. 481 to 494. It will be noted that the four members of the Board of Chiropody Examiners are selected by the Board of Medical Examiners of the Medical and Chirurgical Faculty of Maryland,[2] three from the members of the Mary-

---

2. It is interesting to note that in the original By-laws, adopted May 11, 1950, the 8 Class "A" Members of Maryland Medical Service, Inc. are selected by the Chairman of the Council of the

land Pedic Association and the remaining member from the Board of Medical Examiners itself. The license to the chiropodist may only be granted if three members of the Board of Chiropody Examiners vote in favor of granting the license. The official records of all examinations of prospective chiropodists are required to be spread on the minutes of the Board of Chiropody Examiners and that Board is required to report annually to the Board of Medical Examiners of the Medical and Chirurgical Faculty of Maryland "in detail all of their transactions." Since June 1, 1945, no person can apply for examination by the Board of Chiropody Examiners unless that person is 21 years of age, of good moral character, had received 4 years of instruction in a high school, 2 years of instruction in a college of liberal arts or sciences and was a "graduate of a reputable and legally incorporated school or college of chiropody, acceptable to the Board."

"Chiropody" is defined by Section 492 of Article 43 as follows:

"Chiropody as defined by this subtitle is the diagnosis, surgical, medical or mechanical treatment of all ailments of the human foot. The term "surgical treatment" is defined for the purposes of this subtitle as limited to the cutting or surgery performed on the soft tissues of the foot, superficial to the deep fascia, and to the toes; with the amputation of a toe or toes and the use of an anesthetic, other than local, prohibited."

With chiropody thus limited, with the rather high qualifications required for licensed chiropodists and with the close relationship between the Board of Chiropody Examiners and the Board of Medical Examiners, it cannot be said that the giving to

Medical and Chirurgical Faculty of Maryland; the 4 Class "B" Members being selected by the Board of Directors of Maryland Hospital Service, Inc. The Board of Trustees of the corporation which conducts the business and manages the property of the corporation is made up of these 12 Members, so that the Chairman of the Council of the Medical and Chirurgical Faculty of Maryland appoints two-thirds of the members of the Board of Trustees.

a subscriber the freedom of choice between the doctor of medicine and the chiropodist in the performance of chiropodial services was either unreasonable or contrary to the public interest.

Approaching this subject from another point of view, it appears that unless the General Assembly intended the last clause of Section 355(b)(2) mandatorily to provide a choice, there would have been no purpose at all in adding the clause. In the 1945 amendment when the services of physicians and dentists were added to hospital services, no such clause was added, so that no choice was given between services performed by a doctor of medicine or by a doctor of dental surgery. If the same result were intended as between doctors of medicine and chiropodists, the legislature would have followed the 1945 precedent and would not have added the clause. We cannot assume that the addition of the clause by the legislature was a useless act, having no legal meaning and merely resulted in adding surplusage to the statute. We must construe the statute so as to give effect, if possible to every word, clause and sentence in it, so that no part will be inoperative, superfluous, insignificant or void. *Fisher v. Bethesda Discount Corp.*, 221 Md. 271, 157 A. 2d 265 (1960).

The title to the Acts of 1963, Chapter 548, already set forth, is, in our opinion, consistent with our interpretation of the body of the statute.

Inasmuch as we are of the opinion that the language of the statute is clear, unambiguous and expresses the true legislative intent, we need not consider any extrinsic aids to the construction of the statute. However, as both the appellant and the appellees have considered in their briefs and in the arguments before us, various circumstances in connection with passage of the legislation, we will briefly comment on those circumstances, bearing in mind the admonition of Mr. Justice Holmes in *Pine Hill Coal Co. v. U. S.*, 259 U. S. 191, 196; 42 S. Ct. 482, 66 L. Ed. 894 (1922), that "It is a delicate business to base speculations about the purposes or construction of a statute upon the vicissitudes of its passage."

Both parties filed motions for summary judgment in the lower court and supported their motions by affidavits and exhibits. In the factual data thus submitted, the following appears

which seems to support a mandatory construction of the legislature: 1) a letter, dated March 4, 1963 addressed by the Insurance Commissioner to the Chairman of the Committee on Banking, Insurance and Social Security with reference to Senate Bill No. 231 objecting to the clause at the end of Sec. 355-(b)(2) because of its mandatory nature, but not objecting to the other amendments to existing legislation; 2) a statement made by F. M. Gloth, Jr. who represented Blue Shield before the Committee on Banking, Insurance and Social Security of the Maryland Senate in connection with Senate Bill 231 and who stated, in opposition to the clause mentioned, that it was "mandatory that Blue Shield pay subscribers for covered services performed by chiropodists, and that Blue Shield because of said mandatory provisions expressly opposed the enactment of said bill."[3]

Blue Shield, on the other hand, relies on a letter of April 23, 1963 from the Attorney General to Governor Tawes indicating that the Attorney General had reviewed Senate Bill No. 231, found is legally valid, but indicating that the clause added to Sec. 355(b)(2) was permissive rather than mandatory. The appellees suggest, however, that this opinion is somewhat impaired by the allegations in the answer of the Insurance Commissioner prepared and filed by the Attorney General "that the effect of the aforementioned legislation is capable of more than one construction" and further, that the Insurance Commissioner has not appealed to this Court from the decree of Judge Raine construing the clause as a mandatory provision.

We are of the opinion that the "weight" of the extrinsic aids to construction favor the one given by Judge Raine which we have indicated is the correct construction based upon the language and purposes of the legislation.

The appellant urges that we have determined the principles which govern the case at bar in *Baltimore County Hospital, Inc. v. Maryland Medical Service, Inc.,* 234 Md. 427, 200 A.

---

3. Mr. Gloth was of counsel for Blue Shield in the lower court and in this Court in the present case. At the argument he stated that upon more mature consideration, he had come to the conclusion that he had been in error in the position he took before the Senate Committee.

2d 39 (1964). We do not agree. We held in the *Baltimore County Hospital* case (affirming a decision of Judge Raine in the Circuit Court for Baltimore County) that the Maryland Medical Service, Inc. in its Blue Cross Plan *was not required* to contract with the appellant hospital in that case, there being no monopoly or restraint of trade alleged in the bill of complaint. This case did not involve in any way the mandatory provision of the Act of 1963, Chapter 548 added to Sec. 355-(b)(2). We see no conflict between our decision in the case at bar and our decision in the *Baltimore County Hospital* case.

The appellant further contends that 1) the legislature does not have the power to add the mandatory provision as a part of its power to regulate the insurance industry, and 2) if the provision in question is construed as a mandatory provision, it is unconstitutional as a) a denial of due process of law under the provisions of the Maryland and Federal Constitutions, b) it results in an impairment of contract, contrary to Article 1, Section 10 of the Federal Constitution, and c) it denies the appellant its freedom of contract. We are of the opinion that none of these contentions has merit.

It is well established that the insurance industry is affected with a public interest and may be regulated by the States within constitutional limits. *Allied American Mutual Fire Insurance Co. v. Commissioner of Motor Vehicles,* 219 Md. 607, 150 A. 2d 421 (1959) ; *Keystone Mutual Casualty Company v. Hinds,* 180 Md. 676, 26 A. 2d 761 (1942). The public interest in insurance is quite different from that involved in paper hanging which our predecessors held in *Dasch v. Jackson,* 170 Md. 251, 183 A. 534 (1936), relied upon by Blue Shield, had no substantial relation to the public health and safety and was not subject to the regulations attempted to be imposed by the State. In our opinion, the mandatory provision is one which the legislature could reasonably believe was in the public interest. It does not single out chiropodists as a favored class whose activities "enhance a miniscule portion of the people" as suggested by Blue Shield. It gives the subscriber to the Blue Shield agreements entered into or renewed subsequent to June 1, 1963 the freedom of choice between doctors of medicine and chiropodists for chiropodial service covered by the agreement with reim-

bursement to the subscriber for such service rendered by either a physician or a chiropodist. As both physicians and chiropodists are licensed by the State, with entirely adequate provisions for qualification and examination to protect the public interest, it is not unreasonable to give the subscriber the freedom of choice between them when chiropodial services are involved with a provision for reimbursement to the subscriber however he exercises his choice. It may well be that in a particular situation a chiropodist trained in a narrow and limited field of treatment for a specified part of the human body would be as well qualified to give the limited, specific treatment as a doctor of medicine who has not had the specialized training and practice in this limited field.[4] The reimbursement to the subscriber for chiropodial service, if covered by the contract with Blue Shield, does not increase the financial obligation of Blue Shield as it is of no financial importance to Blue Shield to whom it pays the amount specified in the contract. Blue Shield suggests that the giving of the freedom of choice will result in increased claims, but there is no evidence of this in the record and we cannot believe that this would be the case, as the availability of either doctors of medicine or of chiropodists to treat the feet of the subscriber does not *cause* the disease or damage to the feet, the treatment of which is covered by the Blue Shield contract.

Does the mandatory legislation impair the freedom of Blue Shield to contract? We think not. As we have indicated, no new or additional coverage is attempted by the legislation. The mandatory provision merely provides that *if* a chiropodial service is covered by the contract with Blue Shield, the subscriber shall be reimbursed whether that service under the contract is provided by a physician or a chiropodist. There is no payment required to a chiropodist. Blue Shield is not required to contract with chiropodists or any one else, and is not required to

---

4. This was recognized by the Judicial Council of the American Medical Association in the Journal of the American Medical Association of June 7, 1958 in which it stated: "Chiropody is * * * a practice ancillary—a handmaiden—to medical practice in a limited field considered not important enough for a doctor of medicine to attend and therefore too often neglected."

insure any subscriber against the cost of any chiropodial service or services. Its freedom of contract is not impaired in any constitutional sense, as "freedom of contract is subject to legislative regulation in the interest of public health, safety, morals or welfare." *Blum v. Engelman,* 190 Md. 109, 115, 57 A. 2d 421 (1948). In our opinion, the mandatory provision is not "unreasonable, arbitrary or capricious" and the means selected by the General Assembly did have "a real and substantial relation to the object sought to be obtained," so that the provision did not exceed the scope of regulation our predecessors in *Blum v. Engelman, supra* indicated was constitutionally permitted. See *United Medical Service, Inc. v. Holz,* 5 Misc. 2d 999, 161 N. Y. S. 2d 624 (1957, Sup. Ct. of N. Y. Spec. Term, N. Y. Co., Part I; unanimously affirmed without opinion by the Supreme Court of New York, Appellate Division on December 10, 1957, 4 App. Div. 2d 1017, 169 N. Y. S. 2d 416) in which the court held that a statutory requirement was mandatory which provided that a medical service plan (the New York Blue Shield Plan) allow reimbursement to a subscriber for treatment in the field of oral surgery whether performed by a physician or a dentist, and did not constitutionally impair the freedom of contract of the corporation operating the medical service plan.

The mandatory provision does not impair the obligations of Blue Shield's contracts with its subscribers. It does not apply to any contracts in force on June 1, 1963, when the statute became effective, but only to contracts entered into or renewed subsequent to the effective date of the statute. The legislation, therefore, does not impair any vested right in any existing contract and is not within the guarantee provided by Article 1, Section 10 of the Federal Constitution.

The Supreme Court of New York, Appellate Division, construed a New York statute similar to the Act of 1963, Chapter 548, to be mandatory and effective in medical service contracts issued or renewed after the effective date of the New York statute, in *Western New York Medical Plan, Inc. v. Wikler,* 8 App. Div. 2d 988, 189 N. Y. S. 2d 61 (1959-modifying and affirming the same case reported at 15 Misc. 2d 277, 178 N. Y. S. 2d 981). The *Wikler* case was cited with approval and

followed by the Supreme Court of New York, Appellate Division, in *Cooper v. Commercial Insurance Co.,* 14 App. Div. 2d 55, 216 N.Y.S. 2d 1004, 1006 (1961).[6]

This brings us to the final point to be considered, i.e., does the mandatory provision of the 1963 statute apply to the contracts between Blue Shield and the appellants, Hinkle and Bridgers? Judge Raine in paragraph 1 of the decree of July 30, 1964 held that it did not. We disagree with Judge Raine on this point.

As we have already pointed out, the Blue Shield Plan A Membership Certificate does not contain a provision for renewal. Article VII of the General Conditions of the Certificate provides that: "All rights and benefits hereunder accrue to the subscriber only for and during the period for which subscription charges have been accepted by Blue Shield." The Subscription Agreement terminates after the expiration of the thirty day grace period allowed for the payment of subscription charges, or by either the applicant or Blue Shield, at any time giving written notice to the other. The Certificate provides that the subscription charges are payable in advance and when these charges are paid by the applicant, he is entitled to the benefits set forth in the Certificate "after the effective date shown on the membership card issued as evidence of the acceptance of the Subscription Application."

The record is not clear in regard to when the membership card was issued to the applicants involved in this case or when new charges were payable by those applicants and accepted by Blue Shield. The appellees state in their brief that Blue Shield accepted subscription charges from the applicants subsequent to June 1, 1963, the effective date of the Act of 1963, Chapter 548, and this is not contradicted in the reply brief of the appellants.

---

6. The Wikler case has also been cited with approval and followed by the Supreme Court of Minnesota in Taylor v. American National Insurance Co., 264 Minn. 21, 117 N.W. 2d 408, 410 (1962) and by the Supreme Court of California in Interinsurance Exchange of the Auto. Club v. Ohio Casualty Insurance Co., 23 C.R. 592, 595, 373 P. 2d 640, 643 (1962).

Assuming for the consideration of this point (the exact factual situation may be determined by the lower court upon the remand of the case), that Blue Shield did accept subscription charges in renewal of the agreement between Blue Shield and the appellees Bridgers and Hinkle, subsequent to June 1, 1963, we are of the opinion that such acceptance constituted a new agreement between the parties and that this new agreement was subject to and included by operation of law the mandatory provision added by the Act of 1963, Chapter 548.

In *World Insurance Company v. Perry,* 210 Md. 449, 454, 124 A. 2d 259, 262 (1956), Judge Delaplaine, speaking for the court stated:

> "The rule is equally clear that a renewal of a policy by the payment of a new premium and the issuance of a receipt therefor, where there is no provision in the policy for its renewal, is a new contract in that it cannot be made without the mutual consent of the parties and a meeting of the minds on all the essential terms of the contract. The parties may renew the policy on terms different from those contained in the original contract; but, of course, the terms of the policy, unless otherwise expressed, are not changed by a renewal, but are merely continued in force as binding upon the parties."

This new agreement, entered into after the effective date of the amending statute, has incorporated into it the new mandatory provision. See *Keystone Mutual Casualty Co. v. Hinds, supra; Wilkins v. Inland Mutual Insurance Co.,* 253 F. 2d 489 (4 Cir. 1958, affirming a judgment rendered by Chief Judge Thomsen in the United States District Court for the District of Maryland in *Inland Mutual Insurance Co. v. Peterson, et al.,* 148 F. Supp. 392 (1957)); *Trapp v. Metropolitan Life Insurance Co.,* 70 F. 2d 976 (8th Cir. 1934—opinion adhered to in 72 F. 2d 374), cert. den. 293 U. S. 596, 55 S. Ct. 112, 79 L. Ed. 690.

By paragraphs 2 and 3 of the decree of July 30, 1964, Judge Raine adjudged that the existing contracts between Blue Shield and its subscribers do not now conform to the requirements

of Article 48A, Sec. 355(b) and that the Insurance Commissioner be directed to require Blue Shield to comply with this provision of the statute. These provisions of the order are, in our opinion, correct.

> *Order affirmed as to paragraphs 2 and 3 and reversed as to paragraph 1; the case remanded for further proceedings and the entry of an order in accordance with this opinion; the appellant to pay the costs.*