DAKE ET, DEPENDANT CHILDREN, IN RE.

Juvenile Court, Huron County.

No. 3426.   Decided November 21, 1961.

YOUNG, JR., J. This action was commenced on May 3, 1961, by a complaint signed by Geo. W. Lawrence, Director of the Huron County Department of Public Welfare.   The complaint alleged that Rosann June Dake, born 12-14-58, and Teila Jean Dake, born 5-12-60 "appear to be dependent children, in that the mother, Nicka Dake, is the sole parent, dependent upon public support and presently in the Fisher-Titus Memorial Hospital, and that the mother has requested the County Welfare Department to take charge of her children.   And in that their condition or environment is such as to warrant the State, in the interests of said children, in assuming their guardianship."

An order was entered setting the matter for hearing on May 23, 1961, ordering citation to be served on Miss Dake, and further ordering that the children's custody be immediately assumed by the Court.   Personal service of the citation was made.   On the date set, Miss Dake appeared with counsel, and

a continuance was ordered until June 2, 1961. On June 2nd, the matter was again continued, and finally came on for hearing on August 4th, at which time Miss Dake appeared with counsel, but did not testify. The assistant Prosecuting Attorney appeared on behalf of the Welfare Department.

From the evidence it appeared that Nicka Dake, the mother of the two children, is twenty-five years old, and has never been married. She has had four children, the oldest two born about in 1955 and 1956. The whereabouts of those children does not appear, but the evidence showed that they were not at any of the times mentioned in Miss Dake's custody.

In December of 1959, Miss Dake made application to the Welfare Department for financial assistance, but before it could be granted or a home visit made, she advised the Department that she no longer needed it. In April, 1960, Miss Dake again asked the Welfare Department for assistance, and was granted cash relief and a grocery order. Commencing in May, 1960, she was placed under the Aid for Dependent Children program. During the ensuing year, she received $586.82 from general relief funds, and $1323.00 from the A. D. C. program, or a total of $1909.82.

During this year she was visited rather regularly by a Welfare Department case-worker, who testified that her housekeeping was untidy, but not filthy. The Child Welfare Worker who came to take the two children into custody, testified that at that time Miss Dake's home was very much in disarray, clothing lying around, remnants of food on the table, a large accumulation of dirty dishes and soiled toys lying about, and the children's bed soiled. A man named Rigby was with the children when the worker arrived.

The evidence also showed that during the year from April 1960 to May, 1961, Miss Dake and the children lived in three different locations.

It further appears that for several years Miss Dake lived with her sister Nancy. During that time she worked at a large number of different jobs. Nancy had an illegitimate child born in January, 1958, during the period they were living together. Nancy was married on June 5, 1959, but Miss Dake continued to live with her until September of 1959. Some time prior to

May 3, 1961, Miss Dake again became pregnant, but lost the child, either by miscarriage or self-induced abortion at the time she was in the hospital and this action was commenced.

The evidence also showed that the two children were in good physical condition, and had been seen regularly by their family doctor, who had treated them only for routine matters.

The Welfare Department is seeking permanent custody of the children, which would completely cut off Miss Dake's parental rights, and free the children for adoptive placement. Miss Dake, through her counsel, is seeking to have the children returned to her custody.

The facts have been stated in considerable detail, in order to show clearly the very narrow issue which is presented for determination. Narrow as it may be, this issue is one of great importance, and very difficult of determination. Briefly stated it is whether a woman who is so devoid of morals and intelligence as to bring forth a series of illegitimate children who must be supported by public funds, is entitled to retain the custody of those children. Is a woman who is incapable of ordering her own life in accordance with the prevailing legal and moral codes, capable of raising children without a father?

Although this particular problem is one that is much discussed in the public press these days, there seems to be no legal authority upon it apart from the various statutes dealing with dependent and neglected children. Statutory changes in the welfare laws of a few states, and a notorious change in administrative regulations in the city of Newburgh, New York, have undertaken to deny public assistance to women who continue to have illegitimate children after they have started to receive relief or aid to dependent children payments, but no such changes or rulings have been made in Ohio.

The moral and ethical questions that are involved in this problem are numerous and complex. If the mother of several illegitimate children is denied financial help when she has another such child, it is argued that the innocent children are being made to suffer for their mother's wrong. Conversely, it is said that if no distinction is made between legitimate and illegitimate children, public money is being used to encourage immorality, since the more illegitimate children a woman has, the more money she can get. It might perhaps be mentioned

that the Decalog, which is the basis of our moral code, specifically states that the sins of the fathers may be visited upon the children unto the third and fourth generation, so that the argument against making the children suffer for the mother's wrong can be attacked on ethical grounds.

However, the problem here presented must be resolved by legal reasoning. Resort must be made to the statutes and decisions to determine the issue stated above.

This actions is governed by Section 2151.04, Revised Code, which reads as follows:

"As used in Sections 2151.01 to 2151.54, inclusive, Revised Code, 'dependent child' includes any child:

"(A) Who is homeless or destitute or without proper care or support through no fault of his parents, guardian, or custodian;

"(B) Who lacks proper care or support by reason of the mental or physical condition of his parents, guardian, or custodian;

"(C) Whose condition or environment is such as to warrant the state, in the interests of the child, in assuming his guardianship."

While it is perhaps arguable that under the complaint paragraph (B) of Section 2151.04, Revised Code, is applicable to the present situation, this court prefers to exclude that paragraph, holding that if the children here are found dependent, such finding must be based on paragraph (C) of the statute.

This court has previously held, in the case of *In re Douglas*, 82 Ohio Law Abs., 170, 164 N. E. (2d), 475, 11 Ohio Opinions (2d), 340, that in determining whether the condition or environment of a child is such as to warrant the state, in the interests of the child, in assuming his guardianship, the primary consideration should be the welfare of the child.

Thus the question presented resolves itself to whether the welfare of the children here involved will be advanced by leaving them in their mother's care, without a father, stigmatized as illegitimate, supported mainly by public funds, and in an atmosphere completely lacking in moral decency, rather than by removing them completely and permanently from their natural mother, so that they may have the chance of normal upbringing in a decent home, with two loving parents.

A general text statement of the law applicable to custody of illegitimate children appears in 7 Ohio Jurisprudence (2d), 473, Bastardy, Sec. 43, as follows:

"However, although the mother has the superior legal right to custody, yet, in proceedings to determine custody, her legal right is not absolute, attention being paid to the welfare of the illegitimate child, and its custody will be placed elsewhere when the mother's continued custody would be likely to cause injury to the child, as when her condust is unchaste or impure, * * *"

This statement might well be considered to be dispositive of the problem here involved, but for two points. The first is that a careful examination of a large number of cases cited directly or indirectly in support of the text fails to disclose a single one in which the statement is anything but dictum as applied to the present situation, although some are powerful statements of the rule.

For example, in *Hunter* v. *Dowdy*, 100 Ga., 28 S. E., 387, an action in Habeas Corpus to decide the custody of a young girl between her mother and an orphan asylum, the court says:

"We simply hold that a Habeas Corpus court, in deciding a controversy over the custody of a young girl between her mother and another, commits no abuse of discretion in awarding the child to another, if there is evidence to warrant a finding that the mother is a lewd woman. It makes no difference who the other contestant may be. Any fate would be better for the child than the disgrace and ruin which would follow her prostitution. No place could be worse for her than the home of a wicked and shameless mother. * * * Assuming that the mother was lewd, the danger of the girl becoming so, if committed to such a woman's care, would be so great that no court would be justified in subjecting the child to such a risk."

However, from other Georgia cases it appears that the order granting custody to an orphanage in such cases is not a permanent one, but the mother might later, in another action, regain custody upon showing that she had reformed, and given up her improper habits. *Moore* v. *Dozier*, 128 Ga., 90, 57 S. E., 110 at 113.

In the case of *Heritage* v. *Hedges*, 72 Ind., 247, the court says,

"It was highly proper to remove the child from the custody of a mother, whose unchaste and impure conduct would have exerted an evil influence upon the life and character of her child."

However, an examination of the case shows that the question of custody was in no way involved, the action being an interpleader between the mother's assignee of a judgment for support of the child, and the child's guardian, to determine who should get the support money which had been paid into court.

The case that comes closest to the present one is *Purinton* v. *Jamrock*, 195 Mass., 187, 80 N. E., 802, 18 L. R. A. (N. S.), 926, for there the mother did lose custody to a child which had been placed for adoption by an agency that had the child, because of her misconduct, but the misconduct is only described as being "neglect, crime, drunkenness, or other vice." There was besides considerable evidence of an abandonment of the child after it was originally taken from the mother upon the vague grounds stated.

The second, and more important point is that the text itself concerns only the matter of custody, while we are here dealing with parental rights.

To illustrate this important difference, reference may be had to cases dealing with the matter of custody of children as between parents who are divorced or separated. Large numbers of such cases can easily be located in which a mother who gives birth to illegitimate children, or is guilty of serious immorality, loses custody of the children. For example see *Watson* v. *Watson*, 146 N. E. (2d), 443, 76 Ohio Law Abs., 348, and *Tanner* v. *Tanner*, 78 Ohio App., 178 at 182, 62 N. E. (2d), 654, 33 Ohio Opinions, 513, 33 Ohio Law Abs., 65. There is an infinity of cases on this point in other jurisdictions. A few recent ones are: *Immerman* v. *Immerman*, 1 Cal. Rptr., 298; *Salley* v. *Salley*, 116 S. (2d), 296; *Shrout* v. *Shrout*, 356 P. (2d), 935; *Comm. ex rel. Keer,* v. *Cress,* 168 A. (2d), 788.

However, in all such cases, either expressly or impliedly the right remains in the mother to regain custody should she cease her immoral conduct. *In re Kincaid*, 45 Ohio Law Abs., 340. Thus such cases are not helpful in deciding the problems here presented.

What few cases even touch upon this problem seem rather to lean to the view that the mere immorality of the mother of an illegitimate child is not sufficient to justify permanently cutting off her parental rights. In the case of *In re Gary*, 167 N. E. (2d), 509, 83 Ohio Law Abs., 486, the court of appeals affirms a judgment of the court of common pleas awarding custody of an illegitimate child to its mother, who had several other illegitimate children, in her action in habeas corpus against the child's aunt. There is, however, a strong dissenting opinion by Judge Hurd.

In the case of *People, ex rel. Anonymous,* v. *Anonymous,* 195 N. Y. S. (2d), 1009, at p. 1016, the trial court holds that the mere fact the child in question was the relator's second illegitimate child was not sufficient to demonstrate her unfitness as a mother. However, the court there seems to be relying on a decision of the state's highest court, *People, ex rel. Kropp,* v. *Shepsky,* 305 N. Y., 465, 113 N. E. (2d), 801. An examination of the decisions of the New York Court of Appeals in matters of this kind reveals that the law of New York differs markedly from the law of Ohio as expressed by our Supreme Court in such cases as *Clark* v. *Bayer,* 32 Ohio St., 299, and *In re Tilton,* 161 Ohio St., 571, 120 N. E. (2d), 445, 53 Ohio Opinions, 427. In New York, little, if any, consideration is given to the welfare of the child. The naked legal rights of the parent are all important. In Ohio, the welfare of the child is paramount, and no supposed parental right to custody can stand against it.

When the law is thus unclear, there should be a resort to reason and experience to help determine the issues. The records of this court now contain cases of children whose parents were wards of the court because of the faults and habits of their grandparents, who were wards of the court because of the misconduct of the great-grandparents. The cases in these records are too numerous to count where the mother of an illegitimate child was herself illegitimate or conceived out of wedlock.

Must this court sit idly and impotently by, and permit such unholy sequences to go on forever, particularly when the continuance must be at direct public expense? That cannot be the law, or if it be the law, some higher court than this must so declare it.

490

It will be the finding of this court that the two children in question are dependent children, and permanent custody will be granted to the Huron County Welfare Department, and an entry may be drawn accordingly. Bond for appeal, or supersedeas bond, is fixed at Fifty Dollars ($50.00).