IN RE CAGER, ᴇᴛ ᴀʟ.

[No. 353, September Term, 1967.]

474

*Decided December 3, 1968.*

The cause was argued before HAMMOND, C. J., and BARNES, McWILLIAMS, SINGLEY and SMITH, JJ.

*Frank M. Kratovil* and *Norman Dorsen,* with whom was *Lois P. Sheinfeld* on the brief, for infant appellants, Cheryl Cager and others.

*John J. Sexton,* with whom were *David Tillotson, Frank Reeves, Charles Dukes, Jr., Gerald Smith, James O. Freedman, Jack Greenberg, Leroy D. Clark, Philip G. Schrag* and

*W. Haywood Burns* on the brief, for appellants Barbara Jean Cager, Doris L. Patterson, and Brenda LaVerne Jackson.

*Joseph R. Raymond, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, Arthur A. Marshall, Jr., State's Attorney for Prince George's County,* and *Vincent J. Fermia, Assistant State's Attorney for Prince George's County,* on the brief, for appellee.

Amicus Curiae brief filed by Washington Chapter of the Medical Committee for Human Rights. *Harold P. Green, Patricia H. Latham* and *James B. Blinkoff* on the brief.

Amicus Curiae brief filed by Planned Parenthood Federation of America, Inc., Planned Parenthood Association of Maryland, Inc., and Planned Parenthood of Metropolitan Washington, D. C., Inc. *Bernard W. Rubenstein* and *Edelman, Levin, Levy & Rubenstein,* and *Greenbaum, Wolff & Ernst, Harriet F. Pilpel* and *Nancy F. Wechsler* on the brief.

HAMMOND, C. J., delivered the opinion of the Court. BARNES, J., dissented and filed a dissenting opinion. (See p. 486 *infra.*)

The Circuit Court for Prince George's County, proceeding under Code (1966 Repl. Vol.), Art. 26, §§ 51 through 71, "Juvenile Causes," and particularly § 52 (f) "Neglected child," [1] found various young illegitimate infants to be living in an un-

---

1. Section 52 (f) defines a "neglected child" as a child: "(1) who is without proper guardianship; (2) whose parent, guardian or person with whom the child lives, by reason of cruelty, mental incapacity, immorality or depravity, is unfit to care properly for such a child; (3) who is under unlawful or improper care, supervision, custody or restraint, by any person, corporation, agency, association, institution or other organization or who is unlawfully kept out of school; (4) whose parent, guardian or custodian neglects or refuses, when able to do so, to provide necessary medical, surgical, institutional or hospital care for such child; (5) who is in such condition of want or suffering, or is under such improper guardianship or control, or is engaged in such occupation as to injure or endanger the morals or health of himself or others; or (6) who is living in a home which fails to provide a stable moral environment."

stable moral environment and therefore neglected, solely be-
cause each infant lived in a home with the mother and at least
one illegitimate sibling, and ordered the infants to be taken from
their mothers and placed in foster homes. The appeals are by
the guardian *ad litem* of the infants and the three mothers.
Planned Parenthood Federation of America, Inc., Planned Par-
enthood Association of Maryland, Inc., Planned Parenthood of
Metropolitan Washington, D. C., Inc. and the Washington
Chapter of the Medical Committee for Human Rights filed
briefs as amici curiae.

In his opinion Judge Bowen said the three cases :

> "are test cases designed to determine whether * * * the
> State law furnishes a vehicle to assist in the control
> of the problem of illegitimacy, its mounting costs to the
> taxpayers, and its mounting costs in human misery
> and suffering. * * * If the statute * * * is valid * * *
> we think the State's Attorney's office will proceed with
> its use in those cases where it applies. * * * As the
> Court sees it, these cases come before it on * * * the
> minimum of evidence * * *. [O]ther evidence could
> be brought before the Court of the surroundings in
> these homes, of the disposition of the parents, of the
> condition of the children, and a great many other
> things * * *. [T]he charge * * * is supported sub-
> stantially only by the stipulation of facts.[2] Other evi-
> dence can be gleaned perhaps from the birth certifi-
> cates and from the report which was submitted, but we
> do not consider that, we consider the case on these

---

2. The stipulation was that the appellant Jackson has had three
children born out of wedlock; appellant Cager has had four, and
appellant Patterson has had three, that all the children are alive
and that, with one exception, all of the children born to a given
mother are residing with that mother.

In his closing remarks the State's Attorney went beyond the
stipulation by giving information as to the ages of the mothers—
two were in their teens—of the children, the names of the fathers,
which in each instance save one were different, and that their
occupations and whereabouts were unknown, and that each mother
had had an illegitimate child within the last twelve months.

facts: * * * these women have conducted themselves in such a way that they have brought into the world more than one illegitimate child, that these children are now living together with their mother under the same roof, or in the same group unit * * *. [T]he question to be decided is whether or not on that set of minimum facts, the Court can find that they are neglected within the meaning of the Maryland law * * *. [A]re these children living in an unstable moral environment.

* * *

"Most first illegitimate children * * * are the result of a mistake * * *. The second time around we think represents a lack of judgment and demonstrates an unstable moral attitude on the part of the mother * * * that is inconsistent with the minimum moral standard the community requires.

* * *

"We have no difficulty concluding that the words unstable moral environment relate or were intended to apply to a situation where a mother has had a series of illegitimate children such as the mothers had in these cases. And that such a series * * * constitutes on the part of the mother neglect of each of the children involved [within the meaning of the statute]."

We think that Judge Bowen's conclusion that an illegitimate child can judicially be found to be neglected because of the sole fact that he lives with a mother who has had another illegitimate child who also lives with her is erroneous.

The purposes of § 52 (f) of Art. 26 of the Code, as revealed by its legislatively prescribed standards, must be considered in determining as a fact whether a child is neglected. The statute asks whether the person with whom the child lives "by reason of cruelty, mental incapacity, immorality or depravity, is unfit to care properly for such a child." It is concerned with whether the child is under unlawful or improper care, supervision or restraint by any person or entity. Does the child's parent or custodian fail to provide necessary medical care; are

the health and morals of the child endangered by his custody, environment or occupation, and finally, does the child live in a home "which fails to provide a stable moral environment." In determining whether a child is neglected because he lives in an unstable moral environment, the court shall consider, *among other things,* whether the person with whom the child lives:

"(i) Is unable to provide such environment by reasons of immaturity, or emotional, mental or physical disability;

(ii) Is engaging in promiscuous conduct inside or outside the home;

(iii) Is cohabiting with a person to whom he or she is not married;

(iv) Is pregnant with an illegitimate child; or

(v) Has, within a period of twelve months preceding the filing of the petition alleging the child to be neglected, either been pregnant with or given birth to another child to whose putative father she was not legally married at the time of conception, or has not thereafter married."

The basis for determining neglect must be broader than that on which Judge Bowen rested his determination. Being pregnant with an illegitimate child or having given birth to an illegitimate child within twelve months of the filing of the petition alleging the child to be neglected are two factors to be considered under the statute, "among other things," as indicating neglect but they cannot alone and automatically be found to be indicators of that fact. The "other things" the court is directed to consider in determining whether there is or is not a stable moral environment must include the factors previously enumerated in § 52 (f), pertinent to the particular case. Furthermore, that section does not make explicit as a test of neglect the fact that two illegitimate children of a mother live with her and we do not find such a test reasonably or fairly implicit in the statute as a sole determinant.

It is clear that the ultimate consideration in finding neglect which will serve as a basis for removing a child from its mother's custody is the best interest of the child. As we said in dis-

cussing the provisions of Art. 26, Subtitle "Juvenile Causes," regarding juvenile delinquents in *Ex Parte Cromwell,* 232 Md. 305, 308:

> "It is clear that the statute is aimed at the protection and rehabilitation of the child, not its punishment * * *. The power exercised by the State is that of *parens patriae* * * *. The fact that parents may be deprived of the custody of their own children presents no constitutional problem."

The best interest of a child may or may not be served by removing it from the custody of a mother who has had another illegitimate child but the sole test, automatically applied, cannot in fact or law be pregnancy with an illegitimate child or the recent birth of an illegitimate child added to the presence of an existing illegitimate offspring. *Cf. Levy v. Louisiana,* 391 U. S. 68, 20 L.Ed.2d 436. It is equally clear that although a State is permitted to remove a child from a home that has been judicially determined to be so unsuitable as to be contrary to the welfare of the child and to terminate AFDC assistance to a child living in an unsuitable home if it provides other adequate care and assistance for the child, a State may not deny AFDC assistance to dependent children "on the basis of their mother's alleged immorality or to discourage illegitimate births." *King v. Smith,* 392 U. S. 309, 324, 20 L.Ed.2d 1118, 1129-1130. The cases presently before us would seem to have been instituted not to serve and perpetuate the best interests of the children but rather impermissibly to use the children as pawns in a plan to punish their mothers for their past promiscuity and to discourage them and other females of like weaknesses and inclinations from future productivity.

The brief of the guardian *ad litem* argues that § 52 (f) as interpreted by the court below and as applied is invalid under the equal protection clause of the Fourteenth Amendment because it invidiously and purposefully discriminates against the poor who apply for public assistance. The interpretation we give the statute and the limitations of confidentiality we hereinafter find the applicable statutes to impose on State officials will answer these arguments.

The brief of the mothers contends that § 52 (f) of Art. 26 is unconstitutionally vague. As we read that section, the standards prescribed by the legislature to determine the presence of neglect are sufficiently precise and definite. Although the judicial determination of neglect is civil in nature, the application of the test of sufficient explicitness needed for a criminal statute shows, we think, that a person of ordinary intelligence could determine from § 52 (f) with a fair degree of precision whether a child was or was not neglected, *McGowan v. State*, 220 Md. 117, 125; *McGowan v. Maryland*, 366 U. S. 420, 428, 6 L.Ed.2d 393, 400; *Richards Furniture Corp. v. Board of County Comm'rs of Anne Arundel County*, 233 Md. 249; *Director of Patuxent Institution v. Daniels*, 243 Md. 16, *cert. denied*, 385 U. S. 940, and this is enough to defeat the claim of unconstitutional vagueness.

The mothers also contend that the neglect statute is unconstitutional because it does not apply to Montgomery County which has its own, slightly different, juvenile statute. The contention is answered by *McGowan v. Maryland, supra,* which upheld the Sunday Blue Laws which varied from County to County in Maryland against attack as unconstitutional for that reason.

It would appear from the record that the State's Attorney of Prince George's County was a prime movant in the apparent campaign or crusade to discourage promiscuity and illegitimacy. His goal may have been laudable but his road toward that goal is attacked by the appellants, justifiably we think, as violative of federal and state requirements of confidentiality in that he used information he gleaned from certain forms the mothers were required to present to him for purposes for which it was not intended to and cannot lawfully be used.

The Welfare laws and regulations required each mother to present in person to the States' Attorney a filled out form 218, "Support of Dependent Child, Notification of Dependency and Request for Report of Action," as a prerequisite to obtaining aid for dependent children. Each applicant enters her name and the name and ages of her children, and information concerning the father. The information revealed by the form is intended only to enable the State's Attorney to obtain information about a non-supporting father so that he may either obtain

a warrant for the father's arrest or to institute paternity proceedings. In the cases before us, the forms revealed to the State's Attorney that the names of the children and the fathers did not match, and their use for this purpose led to the investigations which preceded the cases. Title 42 U. S. C. A. § 602 (a) (11) requires that law enforcement officials be notified of aid furnished children who have been deserted or abandoned. Section 602 (a) (9) requires each State to "provide safeguards which restrict the use or disclosure of information concerning applicants and recipients to purposes directly connected with the administration of aid to families with dependent children." A regulation of the United States Department of Health, Education and Welfare states that:

> "The provisions of the Social Security Act, regarding the confidential character of public assistance information have as their objective the protection of applicants and recipients from exploitation and embarrassment."

By means of Art. 88A, § 5, of the Code and regulations promulgated thereunder, Maryland has complied with the federal requirements. Section 5 requires the State Board of Public Welfare to adopt rules and regulations having "the force and effect of law" governing the use of "records, papers, files and communication of the State and local departments concerning applicants and recipients of assistance." The section further provides that the use of such material "by any other agency or department of government to which they may be furnished shall be *limited to the purposes for which they are furnished*" [emphasis added].

The State Department of Public Welfare issued Rule 1000, Confidential Nature of Records, in compliance with the legislature's directive. This rule explains the importance of confidentiality, emphasizing that information in the records may be used only by persons with appropriate authority, and only for purposes *directly* connected with the administration of welfare programs.

The Department states under Part I (2), General Principles and Guides:

"The protection of the rights of individuals served by the public welfare department requires that they be safeguarded against identification as a special group and against exploitation for commercial, personal or political reasons."

Departmental regulations do provide for certain situations under which such records may be used. Part IV, Basis for Use of Information Outside the Department, sets forth three circumstances under which information may be disclosed without the consent of the client:

a. Upon proper judicial order when the purpose is directly connected with the administration of the agency's program * * *.

b. Upon proper legislative order when the purpose is directly connected with the administration of the Department's program.

c. To an officer of the United States, of the state, of the county, or another state, who has a right thereto in his official capacity when the purpose is directly connected with the administration of the Department's program.

We believe this listing to be exclusive in nature.

The use of Form 218 to provide information leading to a neglect proceeding is clearly not sanctioned. The federal and state statutory and administrative provisions all provide that such information is not to be used for purposes extraneous to the AFDC program. The children's eligibility for AFDC is not statutorily designed to be affected by a determination of neglect.

Undoubtedly, a State's Attorney is to be furnished Form 218 for the purpose of proceeding against absent fathers, but the State's Attorney's right is limited to the use of the form for this purpose. Cf. *Mace v. Jung* (Alas.), 386 P.2d 579; see *Terrell v. City of New York* (S. Ct. King's County), reported in NYL.J. (Jan. 29, 1968), p. 19, col. 3. Compare *State ex rel Haughland v. Smythe* (Wash.), 169 P. 2d 706, 165 A.L.R. 1295; *Bell v. Bankers Life & Casualty Co.* (App. Ct. Ind.), 64 N.E.2d 204.

The mothers urge upon us that to deny them the status of parties to the case—as the lower court did, although he heard them as amici through their counsel—violated their rights under both the State and Federal Constitutions and that had they been made parties defendant, as they should have been, they were entitled to court appointed counsel and the payment of costs and expenses at both the trial and appellate level. Their contentions go too far, in our opinion.

Juvenile Court proceedings were not intended to and, constitutionally, need not be conducted under the usual rules governing court trials or even administrative hearings as long as a standard of fairness is recognized and adhered to. Code (1966 Repl. Vol.), Art. 26, §§ 60, 64; *In Matter of Cromwell*, 232 Md. 409, 415. In *In re Gault*, 387 U. S. 1, 30-31, 18 L.Ed.2d 527, the Supreme Court quoted with approval the rule applied to waivers of juvenile jurisdiction in *Kent v. United States*, 383 U. S. 541, 16 L.Ed.2d 84, holding that it applied as well to hearings on delinquency of minors:

> "We do not mean * * * to indicate that the hearing to be held must conform with all of the requirements of a criminal trial or even of the usual administrative hearing; but we do hold that the hearing must measure up to the essentials of due process and fair treatment." [*387 U. S. at 30*]

We think the hearings below fully met the required standards of fairness. The infants involved were represented by a guardian *ad litem* who is a practicing lawyer who energetically and competently sought to forward their interests. The mothers were given full notice of the actions the State's Attorney took and the ends he sought and were given full opportunity to be heard by the court. We find no basis for holding that the mothers were entitled as a matter of right either to be furnished counsel at public expense or given their expenses in connection with the trial or the appeal. In *In re Gault, supra*, the Supreme Court, in dealing with judicial determination of delinquency which could lead to removal of the child from his mother's custody and his incarceration for years in a correctional home, said:

> "We conclude that the Due Process Clause of the

Fourteenth Amendment requires that in respect of proceedings to determine delinquency which may result in commitment to an institution in which the juvenile's freedom is curtailed, the child and his parents must be notified of the *child's* right to be represented by counsel retained by them, or if they are unable to afford counsel, that counsel will be appointed to represent *the child.*" [Emphasis added] [387 U. S. at 41]

We think that no more is required in respect of proceedings to determine neglect, with the qualifications first that only such proceedings which are or will become contested need there be appointed to represent the child a guardian *ad litem* who is a lawyer or a lawyer to represent a guardian who is not a lawyer and, second, that if the representative of the child will not appeal a ruling adverse to the child and the mother wishes to appeal such a ruling, she should be made a party so that she can appeal to represent the child's interest under the provisions of § 65 of Art. 26 that "any interested party aggrieved by any order or decree of the judge may appeal therefrom to the Court of Appeals." Compare *In re Cruse* (Ct. App. La.), 203 So. 2d 893; *Watson v. Department of Public Welfare* (App. Ct. Ind.), 165 N.E.2d 770.

Prince George's County paid the expenses and costs below, including remuneration to the infants' guardian *ad litem,* but would not pay or agree to pay such expenses and costs on appeal. Section 68 of Art. 26 provides that if the parent or custodian of any child coming before the court "under the provisions of this subtitle [§§ 51 through 71 of Art. 26]" is able to pay the costs of the proceedings against the child and it is proper that he do so, the court may order that he do so, and continues: "except as otherwise provided, *all* costs incurred by the prosecution of *cases under this subtitle* shall be paid by the county commissioners" (all emphasis added). We think that "all costs" includes the costs of an appeal pursuant to § 65 of Art. 26, one of the provisions of "this subtitle." The County Commissioners of Prince George's County should therefore pay the costs on appeal, other than the costs attributable to the par-

ticipation of the mothers and the amici, including suitable reasonable remuneration to the guardian *ad litem* for the children. See *Chambers v. District Court of Dubuque County* (Iowa), 152 N.W.2d 818; *Hernandez v. Hardy* (Tex. Ct. Civ. App.), 426 S.W.2d 258; *In re Karren* (Minn.), 159 N.W.2d 402. *Cf. Alexander v. Superintendent*, 246 Md. 334, 339.

> *Orders reversed, costs of the infants and of the state to be paid by the County Commissioners of Prince George's County.*

Barnes, J., dissenting:

I dissent because, in my opinion, the majority (1) has misinterpreted Code (1957) Article 26, Section 52 (f), as amended by Chapter 723 of the Acts of 1963, and (2) has erred in holding that there has been a violation of federal and state requirements of confidentiality in the use of Form 218.

### (1)

In Article 26, Section 52 (f) the General Assembly under the subheading "Juvenile Causes," defines what is a "neglected child." There are *six* separate and alternative criteria, the establishment of *any one of which* will indicate that the child is a "neglected child." These criteria are separately numbered, are marked off by semi-colons and the last criterion is connected with the others by the word "or" and not the word "and." These criteria are as follows:

1. A child who is without proper guardianship;

2. A child whose parent, guardian or person with whom the child lives is unfit to care properly for the child "by reason of cruelty, mental incapacity, immorality or depravity;"

3. A child who is under unlawful or improper care, supervision, custody or restraint by any person, institution or other organization or who is unlawfully kept out of school;

4. A child whose parent, guardian or custodian neglects or refuses, when able to do so, to provide necessary medical, surgical, institutional or hospital care for the child;

5. A child who is in such condition of want or suffering, or who is under such improper guardianship or control, or who is

engaged in such occupation as to injure or endanger the morals or health of himself or others; *or*

6. A child who is living in a home which fails to provide a stable moral environment.

This sixth criterion, which was added to the first five by Chapter 723 of the Acts of 1963, contains five *alternative* criteria which the Court *shall* consider "among other things" to determine whether such stable moral environment exists. These five alternative criteria are whether the parent, guardian or person with whom the child lives:

"(i) Is unable to provide such environment by reasons of immaturity, or emotional, mental or physical disability;

"(ii) Is engaging in promiscuous conduct inside or outside the home;

"(iii) Is cohabiting with a person to whom he or she is not married;

"(iv) Is pregnant with an illegitimate child; *or*

"(v) Has, within a period of twelve months preceding the filing of the petition alleging the child to be neglected, either been pregnant with or given birth to another child to whose putative father she was not legally married at the time of conception, or has not thereafter married (emphasis supplied)."

It can hardly be contended that the six primary criteria are not alternative and that the establishment of any one of them will not justify a finding that the child is a "neglected child." Not only is this clear from the arrangement of the six criteria with separate numbers and separated by semi-colons and by the use of the word "or," but a consideration of the subject matter of the various criteria, itself, indicates this. Compare, for example, criterion No. 4 in regard to the failure to supply necessary medical care, when able to do so, with criterion No. 3 in regard to unlawful care or supervision or the unlawful keeping of the child from school. Indeed, if the six primary criteria were not held to be alternative, it would be next to impossible to find that a child was "neglected" as it would be most im-

probable that all six of the criteria would ever exist simultaneously in a given factual situation.

The same statutory plan is followed in Section 52 (e) in its definition of a "delinquent child," which established six alternative criteria. The first criterion in this definition of a delinquent child is a child "(1) who violates any law or ordinance, or who commits any act which, if committed by an adult, would be a crime not punishable by death or life imprisonment; * * *." We indicated in *In re Cromwell*, 232 Md. 409, 414, 194 A. 2d 88, 90 (1963)—a case involving a determination of delinquency of a child in which the petition alleged only the first criterion already quoted as the *sole* ground for establishing delinquency —that this allegation and the proof supporting it were sufficient to support a finding of delinquency under Section 52 (e). This necessarily means that the establishment of *any one* of the six criteria is sufficient for the establishment of delinquency. Inasmuch as Section 52 (f) follows exactly the same format, punctuation and use of the word "or," as used in Section 52 (e), *In re Cromwell* supports the position that the six criteria in Section 52 (f) are also alternative and that the establishment of one of the six criteria in Section 52 (f) is sufficient to establish that a child is "neglected."

As has been observed, the five criteria to establish whether a stable moral environment exists are set forth in the same format, punctuation and in the use of the word "or," as used in Section 52, subsections (e) and (f) in reciting the six criteria in each subsection. It is reasonable to conclude from this legislative usage that the five criteria mentioned under (6) of subsection (f) were also intended by the General Assembly to be alternative criteria so that the allegation and establishment of any one of the five criteria would justify and effectively support a finding that a "stable moral environment" did not exist. This construction must almost necessarily be correct as here again it would be most unlikely that all five criteria would exist simultaneously. If all five must exist simultaneously, it would mean that only a mother who was at the time of the petition "pregnant with an illegitimate child," as provided in criterion (iv), could fail to "provide a stable moral environment," although all of the other four criteria might exist. This appears

to me to be a most unreasonable construction resulting in an absurd and unjust consequence which the Court should not assume was the legislative intent. See *B. F. Saul Co. v. West End Park North, Inc.,* 250 Md. 707, 722, 246 A. 2d 591, 601 (1968), and prior Maryland cases cited in that opinion.

It is clear to me that the words "among other things" mean that the Court *may* consider facts other than the five criteria which follow, but *shall consider* the five criteria and if any one is applicable in the situation, and the facts support its existence, the Court is then justified in finding that a stable moral environment does not exist. More than one criterion *may* be applicable and established, but only one *must* be applicable and established. This is what the language clearly means to me and it is consistent with the other language in Section 52 as well as with our opinion in *In re Cromwell, supra.*

When the legislative intent is apparent from the words used, there is no need to look further for the legislative intent. The duty of this Court is to carry out that intention. As we stated in *Maryland Medical Service, Inc. v. Carver,* 238 Md. 466, 477-78, 209 A. 2d 582, 588 (1965):

> "The cardinal rule of construction of a statute is to discover and to carry out the real legislative intention. *Barnes v. State, ex rel Pinkney,* 236 Md. 564; 204 A. 2d 787, 792 (1962). *Casey Development Corp. v. Montgomery County,* 212 Md. 138, 129 A. 2d 63 (1957). The legislative intent is to be sought in the first instance in the words used in the statute and if there is no ambiguity or obscurity in the language used in the statute, there is usually no need to look elsewhere to ascertain the intent of the legislature. *Board of Supervisors of Election of Baltimore City v. Weiss,* 217 Md. 133, 141 A. 2d 734 (1958). See particularly the comprehensive review of the prior Maryland cases at pages 136 and 137 of 217 Md. If the legislative intent is expressed in clear and unambiguous language, this will be carried into effect by this Court even if this Court might be of the opinion that the policy of the legislation is unwise, or even harsh or unjust, if no

constitutional guarantees are impaired by the legislation. *Schmeizl v. Schmeizl,* 186 Md. 371, 46 A. 2d 619 (1946)."

If it be assumed for the argument that the language of Section 52 (f) (6) is ambiguous, a consideration of the usual rules of construction in the event of statutory ambiguity leads to the same interpretation already given.

First of all, if the language were ambiguous, the courts should consider the evils or mischief which the Legislature sought to remedy and should construe the language so as to effectuate the general purposes and policies of the legislation. *Cooley v. White Cross Health and Beauty Aid Discount Centers, Inc.,* 229 Md. 343, 350, 183 A. 2d 381, 385-86 (1962). Fortunately, Chapter 723 of the Acts of 1963 was an outgrowth of the comprehensive study of the problems of illegitimacy by the excellent Commission to Study Problems of Illegitimacy appointed by Governor Tawes at the request of the General Assembly by its Joint Resolution No. 2 of 1960.[1] This Commission filed its Interim Report

---

1. This Commission consisted of the following members: Thomas P. MacCarthy, Chairman, Baltimore City, then Master in Chancery of the Supreme Bench of Baltimore City and now Administrative Officer of the Supreme Bench; Calhoun Bond, Baltimore City, Attorney, Member of the State Board of Public Welfare; J. Percy Bond, Baltimore City, Director of Admissions and Placement, Morgan State College; Rt. Rev. David I. Dorsch, Baltimore City, Director, Associated Catholic Charities, Archdiocese of Baltimore; Mrs. William J. Fischer, Baltimore City, Member of the Advisory Board, Baltimore City Department of Public Welfare; Hon. Thomas J. Hedrick, Baltimore City, Attorney, Member of Maryland State House of Delegates; Mrs. Gwendolyn C. Lee, Baltimore City, Director of Social Service, Crownsville State Hospital; Gordon Manser, Baltimore City, Director, Health and Welfare Council of the Baltimore Area, Inc.; Herbert Myerberg, Baltimore City, Attorney, Former Chairman, Committee on Liaison with the Family Court of the Bar Association of Baltimore City; Mrs. Frank Z. Oles, Baltimore City, Vice President, Women's Civic League; H. Clifton Owens, Baltimore City, Attorney; Dr. Olive Westbrooke Quinn, Baltimore County, Professor of Sociology, Goucher College; Hon. John L. Sanford, Worcester County, Member of Maryland State Senate; Edward G. Stapleton, Baltimore County, Superintendent of Schools, Baltimore County; Mrs. Violet Hill Whyte, Baltimore City, Sergeant, Baltimore City Police Department.

with the Legislative Council of Maryland on October 9, 1960, and filed its Final Report with the Legislative Council on December 6, 1961. Reference to the Report of the Commission was referred to in the brief of the appellants and in the argument and, in any event, as an official report of a State Commission, this Court may take judicial notice of it. See *Dispatch, Inc. v. City of Erie,* 364 F. 2d 539 (3d Cir., 1966) ; *Department of Public Welfare v. Bohleber,* 21 Ill. 2d 587, 173 N.E.2d 457 (1961). See also *Ex Parte Cromwell, supra,* 232 Md. 305, 309, 192 A. 2d 775, 777-78 (1963). This Report contained a number of recommendations for specific legislation, one of these recommendations being, as will be developed more fully later, the addition of subparagraph (6) to Section 52 (f). This Report gives the general purpose of the proposed legislation and the policy sought to be effectuated by it. It also gives, in part, the legislative history of the legislation, which the courts may examine to ascertain the legislative intent, if the language is ambiguous. *Baltimore Transit Co. v. Metropolitan Transit Authority,* 232 Md. 509, 513, 194 A. 2d 643, 644-45 (1963). It is a fortunate circumstance in this case that the background of the legislation and a substantial portion of the legislative history are available through this Report, as generally speaking, these are not available in Maryland.

The Report is a comprehensive work of 190 printed pages (including the Interim Report of October 9, 1960) and contains a bibliography of 135 sources of study, including books, studies, reports, pamphlets, articles and various unbound material. Much of the research was organized and conducted by Adelaide Dinwoodie Nurco, B.S., M.S.W., and the statistical material consists, in part, of some 80 Tables in the various appendixes giving valuable data on the problem of illegitimacy in Maryland.[2]

---

2. The Report establishes that the problem of illegitimacy in Maryland was a formidable one. Table I of Appendix C (page 132 of the Report) giving the number of anticipated legitimate and illegitimate births for Maryland in 1961 gave the anticipated total number of births of 74,610 of which 67,945 were legitimate and 6,665 were illegitimate. In the entire State on the basis of calculation mentioned something over 8.9% of all births were illegitimate. In Baltimore City the total number of anticipated births was

492

In its Concluding Statement in Chapter Four of its Report, the Commission stated, in part, the following:

"The Commission is neither so naive, nor so affected by 'wishful thinking' to believe that its recommendations individually or in their cumulative effect, will eradicate illegitimacy. However, this Commission does believe that these recommendations, by imposing specific responsibilities upon various agencies of public and private service, and by changing the law upon which society can act, will provide the community with preventive and corrective measures which will have a definite remedial impact upon the problem.

"The Commission believes that its recommendations emphasize prevention and treatment, and avoid the imposition of hardships upon innocent children by reason of their parents' conduct. It further believes that its recommendations recognize the duty of the courts as the proper agency of government to determine what is in the best interests of children, to hold parents to their basic responsibilities and to deal with parental neglect as either indicative of a need for help through social services or as an offense to be punished.

\* \* \*

"Years ago in the interest of children, it became necessary to adopt stern though unpopular laws to enforce school attendance. To retard tuberculosis and venereal disease, the community has passed laws and coordinated all available means of attacking the problems. Today the community stands at a similar point of decision with respect to illegitimacy. Either we must bring into the light of public concern all the ugly facts relating to illegitimacy and attack it through such means, for example, as recommended by the Commission; or accept the alternative of admitting that we are powerless to uphold the Judaeo-Christian concepts

22,635 of which 18,660 were legitimate and 3,975 were illegitimate, the percentage of illegitimacy in that jurisdiction being 17.55% or approximately double the State average.

of sanctity of marriage, standards of family life and concern for the welfare of children."

The Commission made nineteen recommendations in its Report, Recommendation Two being the addition to Article 26, Section 52 (f) with which the case is principally concerned. None of the recommendations is directed toward direct punitive criminal action in regard to the parents of the illegitimate child and, indeed, Recommendation Three specifically recommends against legislation which would punish illicit cohabitation. The thrust of substantially all of the recommendations is toward the welfare of the illegitimate child and the removal of that child from a home which fails to supply a stable moral environment and thus to prevent the rearing of the children in an environment which will likely condition them for the same type of immoral and anti-social conduct as that in which their parents have indulged.

Recommendation Two is as follows:

"The Commission recommends that by appropriate legislation approved by the Legislative Council, the definition of 'neglected child' as set forth in the State Juvenile Court Act and in Public Local Laws in effect in Baltimore City and certain of the counties, be broadened to provide that a child whether legitimate or illegitimate is neglected if living in a home which fails to provide a stable moral environment; and to further provide that the absence of such stable moral environment is prima facie established if the parent, guardian or person with whom the child lives

(1) Is unable to provide such enviroment by reasons of immaturity, emotional, mental or physical disability,

(2) Is engaging in promiscuous conduct inside or outside the home,

(3) Is co-habiting with a person to whom he or she is not married,

(4) Is pregnant with an illegitimate child, or

(5) Has, within a period of twelve months preceding the filing of the petition alleging ne-

glect, either been pregnant with or given birth to an illegitimate child in addition to the child whose neglect is complained of."

The "Comment" on Recommendation Two is important and is as follows:

"Existing law provides that a child is neglected if the person having its custody is *unfit by reason of immorality to 'care properly' for the child*. The Commission believes, that 'immorality' creating an improper environment for a child should be clearly defined in order that public welfare workers and others may know under what specific circumstances they have the duty to file petitions alleging child-neglect.

"After reviewing definitions of child-neglect in the statutes of other states, the Commission adopted its five-point criteria. Florida, Minnesota and Wisconsin have reported the successful application of *one or more of these criteria* in handling the problem of illegitimacy and immorality.

"It is not the intention of the Commission that neglect petitions be filed under this proposed new section against the woman whose *only child* is an illegitimate child. *Actions hereunder would be for the benefit of any child, legitimate or illegitimate, whose parent or guardian is unable to provide a stable moral environment or whose pattern of behavior constitutes prima facie neglect*. This act would give the court an indirect approach to the parent's unacceptable behavior by relating it to the neglect of other existing children (emphasis supplied)."

It seems clear to me that the Commission intended in the preparation of the five sub-criteria, that the establishment of any one of them was sufficient to support a finding of the absence of a stable moral environment.

As introduced into the General Assembly in 1963 as House Bill 6, Recommendation Two of the Commission was substantially followed except the language of sub-criterion (v) was

clarified. During the course of the legislation through the General Assembly, however, the words *"the absence of such stable environment is prima facie established if"* were eliminated by amendment and the present language *"In determining whether such stable moral environment exists, the Court shall consider, among other things,"* the parent, guardian or person, etc., was substituted. As I see it, the purpose of this amendment was to *broaden* the power of the court in making the determination of the existence of a stable moral environment, so that *other criteria* than one of the five criteria mentioned *could* justify the court in finding the absence of the stable moral environment. In short, the court *must* consider whether one or more of the specifically mentioned criteria exist but *may* consider in a particular case other relevant facts not specified.

Counsel for the appellants earnestly argued in their brief and before us at the argument, that this change of language indicated a legislative intention that the establishment of one or more of the named criteria would not "prima facie" establish the absence of the stable moral environment. As already indicated, the language indicates to me that the legislative intent was to *broaden* the courts' power in this regard, and was not intended to indicate a *restriction* on the courts' power in reaching the determination. This is made clear to me not only from the language itself, but also by the fact that after the amendment already mentioned was made in the body of the bill, there was no change made in the original title to the bill which concluded "\* \* \* and specifying conditions the existence of which shall prima facie establish the lack of such environment." The amendatory language is consistent with this provision of the title and if it had not been deemed to have been inconsistent with it, there undoubtedly would have been an amendment of the language of the title to reflect a different intent.

In my opinion, there was evidence in the record in the present case from which the trial court could find and infer that not only subsection (v) of Section 52 (f) was involved, but also subsection (ii)—engaging in promiscuous conduct, subsection (i)—inability to provide a stable moral environment because of immaturity or emotional disability, and possibly subsection (iii)—cohabitation with a person to whom the mother is not mar-

ried. I do not find in the record that the trial court relied *solely
and entirely* on subsection (v). On the contrary in colloquy
between the trial court and Mr. Bourne, counsel for the amicus
curiae mothers, rather indicates the contrary. The colloquy is as
follows:

> "(Mr. Bourne) They are claiming in their argu-
> ment to this Court that you should take into consid-
> eration immaturity and engaging in promiscuous con-
> duct, cohabiting to the person to whom she is not mar-
> ried.
>
> "(The Court) But isn't all that simply ramifications
> and deductions and logical inferences from one fact
> that is before the Court?
>
> "(Mr. Bourne) No, Your Honor. I think that the
> language of the statute precludes any inference of any
> of those first four points by the tense of the verb.
>
> "(The Court) If so, it is contrary to the natural
> laws that the Creator put here in the universe.
>
> "(Mr. Bourne) Well, the law says 'is' unable, is
> engaging, is cohabiting, is pregnant, those are present
> tense. Now then on five we go to 'has.'
>
> "I think we have got to go by the tense of the
> language of the statute.
>
> "(The Court) The only facts that they have of-
> fered into evidence are the ones they stated to you in
> the particulars. They stated they intend to prove that
> these children were living in a house where the mother
> had illegitimate children. That is all they have proved.
> What they are arguing from that fact is what is dis-
> turbing you.
>
> "The arguments and inferences that can be drawn
> from a fact aren't limited by the particulars. The par-
> ticulars are limited only to what you are going to
> prove."

Even if the trial court relied entirely on subsection (v), its
findings from the stipulated facts and proper inferences from
those facts, were, in my opinion, fully supported and justified.
The stipulation of facts in this case was in relevant part as set

forth in Note 2 in the majority opinion, and showed that the three appellant mothers had three, four and three illegitimate children, respectively, that all of the illegitimate children were alive and, with one exception, all of the children born to a given mother were living with that mother. Judge Bowen, in making the findings, stated, in part, as follows:

> "Now the charge, as we understand it, is supported substantially only by the stipulation of facts. Other evidence can be gleaned perhaps from the birth certificates and from the report which was submitted, but we do not consider that, we consider this case on these facts: *That these women have conducted themselves in such a way that they have brought into the world more than one illegitimate child, that those children are now living together with their mother under the same roof, or in the same group unit.*
>
> "*Now the question to be decided is whether or not on that set of minimum facts, the Court can find that they are neglected within the meaning of the Maryland law.*
>
> "This brings us to the resolution of the question raised by that law: *are these children living in an unstable moral environment.*
>
> "This business of an unstable moral environment encompasses the intangible proposition that exists between human beings who live together as a unit related by ties of blood or marriage. The mere absence of a man from a group is not what we are talking about. Widows and divorcees need not be considered as unstable because no man is involved in their home. What is sought to be elicited in the moral question is the recognition by the community that the relationships between the man in the house and the mother of the children are those which meet the minimum acceptable standards of the community. And the minimum acceptable standards in this community for men and women who wish to live together, to have sexual relations and to bring into the world children in union

between themselves is that they be married. And something less than that, we think, is, under the regulations that society has imposed upon itself, immoral.

* * *

"The second time around we think represents a *lack of judgment and demonstrates an unstable moral attitude on the part of the mother.* We think for her to continue to conduct herself in such a way as repeatedly to bring illegitimate children into her household, *reflects a weakness in her character, and a demonstrable view of morals on her part, that is inconsistent with the minimum moral standard the community requires. And the reason therefor, that by her deliberate knowing course of conduct is engaging in sexual relations with men, that produce illegitimate children, she has demonstrated in the most forceful and irrefutable way that she either does not care for the views of society on morals, or caring, is unable to conform her conduct to their minimum standards.*

* * *

"*We have no difficulty concluding that the words unstable moral environment relate or were intended to apply to a situation where a mother had had a series of illegitimate children such as these mothers had in these cases. And that such a series of illegitimate children constitutes on the part of the mother neglect of each of the children involved.*

"*Neglect concerns itself not only with the physical aspects of the children's lives, but with their moral and spiritual existence as well.* That it is impossible for a mother of less than independent wealth to care for three or four or seven or eleven or twelve illegitimate children on the slender means provided her by the welfare department, we think is axiomatic. *That it is virtually impossible for a mother who continues to have illegitimate children by a series of fathers, that it is impossible for such a woman to provide the moral training and the spiritual counseling that ought to surround the nurture of children of tender years so they*

> *will not themselves fall into the difficulties that she has fallen into,* \* \* \*.
>
> "In short, gentlemen, *the Court concludes that the unexplained facts presented in this case demonstrate to the Court's satisfaction that these children are neglected within the meaning of the statute* (emphasis supplied)."

There was no attempt upon the part of the mothers, the guardians *ad litem* of the children or of any of the other parties to produce any evidence which would indicate that notwithstanding the prima facie showing of the absence of a stable moral environment, there were, in fact, existing conditions which would possibly rebut that prima facie showing and possibly establish that a stable moral environment did in fact exist in any of the situations before the Court. The failure to produce any such evidence and entry into the stipulation indicates strongly to me that no such evidence was available.

In my opinion, the trial court correctly interpreted the Maryland statute, and its findings were supported by the record. The record does not indicate to me that the present cases were "instituted not to serve and perpetuate the best interests of the children but rather impermissibly to use the children as pawns in a plan to punish their mothers for their past promiscuity and to discourage them and other females of like weaknesses and inclinations from future productivity" as is indicated in the majority opinion. On the contrary, the record indicates to me that the removal of the children from a home in which a stable moral influence does not exist is definitely for the best interests of those children so that, in the words of the Report of the Commission on Illegitimacy, the children will not be permitted "to live in homes where promiscuity and non-conforming patterns of family life become the accepted standards of living for the children to emulate." If as a peripheral benefit of this primary legislative policy to benefit the illegitimate children, promiscuous parents are led to abandon their immoral life, the public interest is advanced to that extent. This, however, is not the primary purpose of the legislation, nor, in my opinion, was it the primary purpose of the institution of the present cases.

The conclusion of the trial court is in accord with the holding *In re Dake*, 180 N.E.2d 646, 648, 649 (Juvenile Ct. of Huron Co., Ohio, 1961). In that case the mother of four illegitimate children, two of whom were living with her, applied to the Welfare Department of Huron County, Ohio for assistance under the Aid for Dependent Children (A.F.D.C.) program. The Welfare Department then sought custody of the two children living with the mother and requested the Ohio Juvenile Court to declare the children neglected in order to deprive the mother of custody permanently. The Juvenile Court of Huron County, Ohio stated the issue before it as follows:

> "Briefly stated it is whether a woman who is so devoid of morals and intelligence as to bring forth a series of illegitimate children who must be supported by public funds, is entitled to retain the custody of those children. Is a woman who is incapable of ordering her own life in accordance with the prevailing legal and moral codes, incapable of raising children without a father?" (180 N.E.2d at 648.)

In Ohio, as in Maryland,[3] the primary consideration in determining the custody is: "What is the best interest of the child?" The Court decided that the mother was not entitled to retain custody of the two children living with her, deciding that the best interest of these children would not be advanced by:

> "* * * leaving them in their mother's care, without a father, stigmatized as illegitimate, supported mainly

---

3. In Ex Parte Cromwell, supra, we stated in regard to the Maryland Juvenile Court Statute: "* * * It is clear that the statute is aimed at the protection and rehabilitation of the child, not its punishment. Cf. *Moquin v. State*, 216 Md. 524. The power exercised by the State is that of parens patriae. See 43 C.J.S., Infants, § 7. The Maryland statutes are not unique in this respect. See *Pee v. United States*, 274 F. 2d 556 (C.A. D.C.) and cases cited. The fact that parents may be deprived of the custody of their own children presents no constitutional problem. Cf. *Ross v. Pick*, 199 Md. 341, 351 (1952). The test is what is best for the child."

by public funds, and in an atmosphere completely lacking in moral decency, rather than by removing them completely and permanently from their natural mother, so that they may have the chance of normal upbringing in a decent home with two loving parents." (180 N.E.2d at 649.)

See also *In re Turner,* 12 Ohio Misc. 171, 231 N.E.2d 502 (Ct. of Com. Pleas, Starr Co., Ohio, 1967).[4]

### (2)

Nor does the record indicate to me "that the State's Attorney of Prince George's County was a prime movant in the apparent campaign or crusade to discourage promiscuity and illegitimacy," as the majority opinion suggests or that, even though such a goal might have been laudable, his road toward that goal was "violative of federal and state requirements of confidentiality" in the use of information gleaned from "certain forms the mothers were required to present to him for purposes for which it was not intended to and cannot lawfully be used."

The provisions of the various federal and state statutes and regulations are set forth in detail in the majority opinion and need not be further considered here. The end result is that the information on Form 218 of the Welfare Department of Prince George's County may be used for purposes *directly connected* with the administration of the welfare program. There is little question in my mind that the information on Form 218 may be used in the investigation of cases of apparent neglect as such an investigation is directly connected with the welfare program. Indeed, Code (1957) Article 88 A, Section 48 A, added by the Act of 1963, Chapter 423 in accordance with Recommendation Seven of the Commission on Illegitimacy, as one part of the administration of the welfare program, that child neglect proceedings be instituted when information obtained by the Welfare Department indicates that a child is neglected.

Form 218 was presented to the State's Attorney for Prince George's County as required by the County's Welfare Depart-

---

4. It will be noted that the county prosecuting attorney appeared on behalf of the Welfare Department in both In re Dake, and In re Turner.

ment. His contact with the mothers seeking aid for dependent children was not that of attorney and client or even of prosecuting attorney and witness. The State's Attorney in this special situation was merely an administrative agent for the Welfare Department and when the fact of apparent neglect of a child appeared, it was the duty of the State's Attorney to file an appropriate petition to ascertain whether or not the child was a neglected child as defined by the statute. This is not only directly connected with the administration of the welfare program by statute, but it is difficult for me to see how the discovery of neglect of a child for whom AFDC assistance is sought would not be directly connected with the administration of the welfare program apart from the statutory provision. It can hardly be contended that it is a purpose of the AFDC program to subsidize those who neglect their children or to provide for the continuance of the neglect of a child! The removal of neglected children from that assistance, the placing of them in proper foster homes or providing for other proper methods for eliminating the neglect must, of necessity, be directly connected with the administration of the welfare program. I see no violation of either federal or state requirements of confidentiality in the use of the information on Form 218 to investigate cases of apparent child neglect.

If, however, it be assumed, arguendo, that there could be such a violation in the use of information on Form 218 for this purpose, in the present case the *means* by which the information was obtained was not before the trial court or before this Court, on appeal, because all of the parties, *by stipulation,* in open Court, agreed that the children were illegitimate. Under these circumstances any supposed breach of confidentiality is not, in my opinion, properly before us for adjudication in the present cases.

I would affirm.