## RIZZI ET UX. *v.* GOVERNOR OF MARYLAND ET. AL.

[No. 284, September Term, 1969.]

Per Curiam Order filed November 4, 1969.

Opinion filed December 4, 1969.

The cause was argued before HAMMOND, C. J., and BARNES, MCWILLIAMS, FINAN, and SINGLEY, JJ.

*Edward F. Shea, Jr.* and *Joseph Sherbow,* with whom were *Sherbow, Shea & Doyle* on the brief, for appellants.

*Jon F. Oster, Assistant Attorney General,* with whom was *Francis B. Burch, Attorney General,* on the brief, for appellees.

FINAN, J. delivered the opinion of the Court.

This is a taxpayers' suit brought by the complainants, husband and wife, registered voters and owners of property in Baltimore, on which State and city real estate taxes are levied, seeking injunctive and declaratory relief relative to a proposed sale of $40,000,000 of State bonds. The proposed sale represented five separate issues of State bonds to have been known as the Second, Third,

Fourth, Fifth and Sixth Series of the State and Local Facilities Loan of 1969, all of which had been consolidated for public offering by a resolution of the Board of Public Works (Board) at a meeting held September 18, 1969.[1] The Governor, State Comptroller and State Treasurer, in their individual capacity and as the officials constituting the Board, were party defendants.

This suit was engendered by the inflationary fiscal climate which presently and for many months has affected public financing throughout the nation. This climate which has produced spiraling interest rates has caused state and local governments to reappraise their programs for funding capital expenditures. In Maryland, concern became acute last January when the Board sold $55,805,000 of State bonds designated as the "State and Local Facilities Loan of 1969, First Series." The coupon rates on the bonds were 5%, 4.25% and 4.40% and the net interest cost to the State on all of the bonds was at the rate of 4.3255%. The maximum interest rate which the Board may pay is controlled by each of the enabling acts authorizing State loans, which for the purpose of the bond issues involved in this case is 5% per annum. Maryland Code Art. 31, § 2B (e) (3).

For an understanding of the problem presented in this case it is essential that we bear in mind that in addition to the 5% interest limitation expressly set forth in the enabling acts, all of the acts require the Board to issue certificates of indebtedness evidencing the loan according to what is known as "the serial annuity plan" so worked out as to discharge the principal represented by the certificates "within fifteen (15) years" from the date of issue;[2] provided, however, it is not necessary for the

1. This Court issued a *per curiam* order on November 4, 1969, wherein it affirmed the decree of the lower court dated October 21, 1969, which had approved the sale of the Second, Third and Fourth Series ($18,760,000) and held the proposed sale invalid as to the Fifth and Sixth Series ($21,240,000).
2. The fifteen year limitation is a Constitutional requirement set forth in Art. III, § 34 of the Constitution of Maryland:
"No debt shall be hereafter contracted by the General Assembly unless such debt shall be authorized by a law

Board to provide for the redemption of any part of the principal for the first two (2) years from the time of issue. An enabling act, typical of all acts consolidated under the several "Series" comprising the "State and Local Facilities Act of 1969," is Chapter 72 of the Acts of 1962, Section 1 of which reads as follows:

"Section 1. Be it enacted by the General Assembly of Maryland, that the Board of Public Works is authorized and directed to issue a State loan to be known as the Sewage Treatment Works Loan of 1962, in the aggregate amount of Five Million Dollars ($5,000,000).

"The certificate evidencing said loan may be issued all at one time or, in groups, from time to time, as hereinafter provided. All of said certificates evidencing said loan, or any group thereof shall be issued according to what is known as the serial annuity plan so worked out as to discharge the principal represented by said certificates within fifteen (15) years from the time of its issue; provided, however, that it shall not be necessary to provide for the redemption of any part of the principal represented by any certificates for the first two (2) years from the time of the issuance of said certificates."

Bonds issued under a "serial annuity plan" customarily have been divided into series maturing over a fifteen year period. On this basis, interest only is paid during the first two years; then annually for the next thirteen years, interest and a portion of the principal is paid. The amount of principal to be paid each year is so calculated that as interest payments decrease, principal payments increase in such amounts that the total annual cost for interest and principal remains approximately

---

providing for the collection of an annual tax or taxes sufficient to pay the interest on such debt as it falls due, and also to discharge the principal thereof within fifteen years from the time of contracting the same; * * * "

the same throughout the 13 years. The method is similar to the level payment plan of a home mortgage. Thus, the amount of real and personal property taxes which must be collected to repay the bonded indebtedness remains substantially constant over the 13 year period, during which both principal and interest are paid.

In accordance with its practice of selling bonds twice a year the Board planned to market on July 16, 1969, $59,830,000 of bonds to be known as the "State and Local Facilities Loan of 1969, Second Series." [3] However, confronted with the interest limitation of 5% and the knowledge of soaring interest rates, the Board, and understandably so, became market shy and postponed the July sale. After the Board postponed the July 16, 1969 sale, the public press reported that the Board was considering various alternatives to attempt a sale of bonds within the statutory 5% interest limitation.

One alternative was to issue bonds that had a shorter maturity period than the 15 years which traditionally had been used. This proposal was prompted by the knowledge that bonds bearing an interest rate limitation of 5% and a 15 year maturity period were unmarketable. Accordingly, on September 18, 1969, the Board met and adopted resolutions to issue bonds with more attractive short term maturity dates. The five separate issues totaling $40,000,000 and their terms and conditions are as follows:

. 1. $5,920,000 State and Local Facilities Loan of 1969, Second Series.

> This issue would be for a five-year term. Interest only would be paid during the first year and the principal would be paid in annual installments over the remaining four years. It appears that the amount of the principal installments has been so calculated that the total of

---

3. Maryland Code, Art. 31, § 2B(a) (1968 Cum. Supp.) vests the Board of Public Works with the authority to consolidate several authorized bond issues into a single public offering.

principal installment and the interest will be approximately the same throughout each of the four redemption years.

2. $7,810,000 State and Local Facilities Loan of 1969, Third Series.

This issue would be for a five-year term. Interest only would be paid during the first two years and the principal would be paid in annual installments over the remaining three years. It appears that the amount of the principal installments has been so calculated that the total of principal installment and the interest will be approximately the same in each of the three redemption years.

3. $5,030,000 State and Local Facilities Loan of 1969, Fourth Series.

This issue would be for a four-year term. Interest only would be paid during the first year and the principal would be paid over the remaining three years. It appears that the amount of the principal installments has been so calculated that the total of principal installment and interest will be approximately the same in each of the three redemption years.

4. $6,105,000 State and Local Facilities Loan of 1969, Fifth Series.

This issue would be for a three-year term. Interest only would be paid during the first two years and the total principal would be payable in the third year.

5. $15,135,000 State and Local Facilities Loan of 1969, Sixth Series.

This would be for a fifteen-year term. Interest only would be paid during the first two years; in the third year 90% of the principal would be

paid; in the fourth through fifteenth year, each year $125,000 of principal would be paid. In this issue the annual payments of principal and interest would vary from year to year. In the third year, the payment would be very large.

The three basic issues raised by the complainants both in the lower court and before us are (1) that the proposed action by the Board to issue bonds for less than fifteen years violates the provisions of Art. III, § 34 of the Constitution of Maryland, (2) that the action of the Board in issuing the proposed bonds is arbitrary and capricious because it will increase the burden to the taxpayer and impair the State's AAA credit rating, and (3) the proposed manner of issuing the bonds violates the "serial annuity plan" provided by the enabling acts and Maryland Code (1968 Cum. Supp.) Art. 31, § 2B (e) (5).

We believe that the desire to have the assurance attendant to a Court interpretation is the reason prompting the inclusion in this case of the issue regarding the period of amortization for State bonds provided by Art. III, § 34 of the Constitution of Maryland, rather than any sincere doubt on the part of the complainants as to its true meaning. The complainants present the argument that the language of Art. III, § 34, makes it mandatory that bonds be issued for a full 15 year term and not for any lesser term. Such an interpretation would require that the phrase "within 15 years" be interpreted as meaning "at least" or "not less than." We find no support for such an interpretation in the language used in Art. III, § 34. Black's Law Dictionary, 4th Ed., defines "within" as:

"* * * In inner or interior part of, or not longer in time than. *In re White's Estate,* 130 Kan. 714, 288 P. 764, 765. Through. *Mississippi Cent. R. Co. v. Pace,* 109 Miss. 667, 68 So. 926, 927. Inside the limits of. *Sacks v. Legg,* 219 Ill. App. 144, 148; *Ex parte Watson,* 82 W. Va. 201, 95

S. E. 648. On. *Continental Life Ins. Co. v. Wilson,* 36 Ga. App. 540, 137 S. E. 403.

"When used relative to time, has been defined variously as meaning any time before; at or before; at the end of; before the expiration of; not beyond; not exceeding; not later than. *Glenn v. Garrett,* Tex. Civ. App. 84 S.W.2d 515, 516."

In *McDougald v. Incorporated Town of Broken Bow,* 71 Okl. 231, 176 P. 959 (1918), after reviewing many legal definitions of the word "within," the Court ruled that the word, as used in the Constitution of the State of Oklahoma providing that municipal bonds be repaid within 25 years, was intended to have its natural meaning and that an issue of bonds maturing in 15 years came within the meaning of the word as used in the Constitution. In *Pumphrey v. Stockett,* 187 Md. 318, 49 A. 2d 804 (1946), our predecessors in construing the election laws of this State refused to define "within" in such a manner as would equate it with "at least" or "not less than." Accordingly, it is our opinion that the "State and Local Facilities Loan of 1969," Second, Third, Fourth, Fifth and Sixth Series, which are amortized over periods of five years, five years, four years, three years and fifteen years respectively, are not in violation of Art. III, § 34 of the Constitution of Maryland.

Nor do we think that the action of the Board in issuing the proposed bonds was arbitrary and capricious. We believe that the Board in issuing shorter term bonds was pursuing a reasonable alternative. The record reveals the testimony of a knowledgeable investment banker, Mr. Melrose B. O'Rourke, Vice President in charge of municipal bonds for Stein Brothers & Boyce, a large brokerage house based in Baltimore which deals in municipal issues throughout the country, to the effect that, historically the shorter term bonds pay lower interest rates.

It is true that the issuance of the bonds as proposed in the "State and Local Facilities Loan of 1969," as set forth in the opinion, will increase the real property tax

burden over the next five years; however, the total amount of taxes paid will be no greater than if the bonds were amortized over a fifteen year period. As a practical matter, the total amount which a taxpayer will pay to service the bonds will be less since the total amount of interest paid is less when bonds are liquidated over a short period of time. Furthermore, there is no logic to the contention that the proposed plan for issuing the bonds will affect the AAA credit rating now enjoyed by this State. To the contrary shorter term bonds come closer to placing the State on a "pay as you go" basis and should actually enhance the State's credit rating.

Viewing these fiscal considerations against the background of the emergency which confronted the State and the necessity for it to obtain the funds necessary to begin and complete public improvement projects already authorized, we do not think the Board's action was arbitrary and capricious but rather was in promotion of the general welfare of the public. *Truitt v. Board of Public Works,* 243 Md. 375, 391, 392, 221 A. 2d 370 (1966).

We think that Judge Evans, in his opinion in the court below, gave such an excellent review of the historical development in Maryland of "serial annuity financing" that we adopt his opinion treating upon the third contention raised by the complainants:

> "The Complainants' third contention is that under Article 31, § 2B (The Consolidating Act) of the Annotated Code of Maryland (1968 Cum. Supp.), and under the enabling acts which authorize State loans (Enabling Acts), the Board is required to issue bonds according to the serial annuity plan. They further contend that none of the proposed bonds, and particularly the Fifth and Sixth Series, comply with the definition of serial annuity plan.
>
> Section 1 of the Enabling Acts of each of the bond issues which make up the five consolidated bond issues contains the following language:

'The certificates evidencing said loan may be
issued all at one time, or in groups, from time
to time, as hereinafter provided. All of said
certificates evidencing said loan, or any group
thereof, shall be issued according to what is
known as the *serial annuity plan* so worked
out as to discharge the principal represented
by said certificates within fifteen (15) years
from the time of its issue;' [Emphasis sup-
plied.]

"Moreover, the Enabling Acts require that, in
the resolution authorizing the issuance of the
loan, the Board

'* * * set forth in detail the dates when any
of the certificates representing said loan or
any portion thereof are to be redeemed and
the amount to be redeemed upon such dates,
respectively, according to the serial annuity
plan applied to said loan as a whole or to the
group of certificates evidencing a part of said
loan issued at a particular time, as the case
may be.'

The term "serial annuity plan" is apparently
unique to Maryland. The first use of the term
in a bond statute occurred in Chapter 267 of the
Acts of 1914 which created The State Roads
Loan of 1914. The total loan was to be divided
into two parts. $3,000,000 of the loan was to be
dated 1 August 1914 and $3,600,000 was to be
dated 1 February 1915. Section 1 of the Act
provided:

'* * * and the principal amount of said loan
shall be payable upon the serial annuity plan
herein below specified and all within fifteen
years after the issuance thereof.'

Section 2 of the Act actually set out the series
as follows:

'That in issuing the certificates of indebted-
ness for said loan as herein provided in Sec-

tion 1, the Governor, the Comptroller of the Treasury and the Treasurer of this State, or a majority of them, shall issue said certificates according to what is known as the Serial Annuity Plan, and each series as issued shall be lettered beginning with "A" and so on down the Alphabet until the said amount of Six million six hundred thousand dollars ($6,-600,000) shall have been issued, so that the entire principal shall be redeemable as follows; of the three million dollars ($3,000,-000) issue bearing date August 1, 1914:

| | | |
|---|---|---|
| Series "A" | $180,000 | August 1, 1917 |
| Series "B" | 188,000 | August 1, 1918 |
| Series "C" | 195,000 | August 1, 1919 |
| Series "D" | 203,000 | August 1, 1920 |
| Series "E" | 211,000 | August 1, 1921 |
| Series "F" | 220,000 | August 1, 1922 |
| Series "G" | 228,000 | August 1, 1923 |
| Series "H" | 237,000 | August 1, 1924 |
| Series "I" | 247,000 | August 1, 1925 |
| Series "J" | 257,000 | August 1, 1926 |
| Series "K" | 267,000 | August 1, 1927 |
| Series "L" | 278,000 | August 1, 1928 |
| Series "M" | 289,000 | August 1, 1929' |

"A similar schedule was set forth in the statute for the remainder of the loan.

Thus, for the first time the Legislature not only required that bonds be issued according to the serial annuity plan, but actually defined the term by setting forth exactly what it meant.

From 1914 to 1947, the bond issue enabling acts directed the use of the serial annuity plan and actually set out the series, the amount of each series and the redemption dates. Each of these loans was prorated over a fifteen-year period in such a manner that the principal plus interest for any given year remained approxi-

mately the same. Chapter 694 of the Acts of 1947 initiated the language presently employed in all bond issues. The series was not set out as had been the case, but the term "serial annuity plan" was retained. Since 1947, the Board has followed the practice of issuing bonds according to a fifteen-year serial annuity plan. Although the term "serial annuity plan" has never been judicially defined, its meaning is well understood in the world of finance.

"In *Municipal Finance Administration,* International City Manager's Association, Chicago, 1962, p. 309, bonds are classified as follows:

'Bonds, according to method of redemption, fall into the two general types—sinking fund and serial. An issue of the former type becomes due in a lump sum at the end of the term of the loan and is met by annual payments to a sinking fund of amounts which, when invested at compound interest, will produce the amount of the principal by the time it becomes due. An issue of serial bonds, on the other hand, is retired by annual installments directly from appropriations.

'Serial bonds, in turn, are of two general types. *In the case of annuity series the annual debt service payment covering interest and principal during each year bonds are outstanding is approximately the same;* interest payments, accordingly, are higher in the early years and decline as principal payments are made. It is much like an FHA mortgage where the monthly payment remains the same throughout the life of the mortgage. Straight serials provide for approximately equal annual payments of principal; interest payments are large in early years and decline gradually as the bonds approach maturity. In recent years serial bonds have largely re-

placed sinking fund bonds in municipal borrowing, and in some states the use of the sinking fund bonds by municipalities is no longer legal.' (Emphasis supplied.)

"In *Business and Finance Dictionary*, Random House, New York, 1962, Serial Annuity Bonds are defined as: 'Serial Bonds in which the annual installments are so arranged that the payments for interest and principal are approximately the same each year.'

Both Mr. Nossel, the Deputy Comptroller with twenty-nine years' experience in the State Comptroller's office, and Mr. O'Rourke testified that the phrase "serial annuity plan" had a specific meaning with which they were familiar. In his testimony, Mr. O'Rourke first distinguished term bonds which come due all at one time from serial bonds which mature in consecutive years. Bonds issued according to the serial annuity plan are serial bonds issued in such manner as to achieve level debt service or a uni form yearly cost to the State to pay interest and principal on any particular bond issue. The word annuity refers to the tables which are used in the mathematics of computing the amounts of principal which come due each year.

The issuance of bonds according to the serial annuity plan, then, means that the bonds are issued in series so that one series is retired annually, in such amounts that the annual debt service payment covering interest and principal during each year that the bonds are outstanding remains approximately the same. Under such a method, as interest payments decline, principal payments increase.

The Respondents agree that "serial annuity plan" has the above-stated meaning, but they maintain that the language in the Enabling Acts and in Article 31, § 2B (e) 5 is directory

and not mandatory and that, therefore, the State is not required to issue bonds according to the serial annuity plan.

Article 31, § 2B authorizes the Board to consolidate and offer for sale certificates of indebtedness representing two or more State loans or installments thereof. Article 31, § 2B (e) states, in part:

'In the adoption of the resolution authorizing the sale of each 'State and local facilities loan' the Board of Public Works shall also determine and set forth the following matters: * * * (5) the dates when any of the certificates representing said loan are to be redeemed upon such dates, respectively, according to the serial annuity plan applied to such loan.'

The Respondents maintain that the above-quoted provision is directory and not mandatory and rely on the use of the word 'permissive' in Subsection (f) of Article 31, § 2B to support this contention:

'The provisions of this section are permissive only and the decision as to the consolidation of State loans or installments thereof shall be made in the discretion of the Board of Public Works. * * *.'

Whether Subsection (e) 5 read with Subsection (f) requires that all consolidated bond issues be issued according to the serial annuity plan is not a question which it is necessary for this court to decide. This court thinks it is clear that the Legislature, in enacting Article 31, § 2B, intended only to give the Board additional powers to consolidate State loans. It was not the intention to give the Board additional powers to override specific limitations upon the Board's power which the Legislature imposed

in the Enabling Acts. Subsection (h) of the same act provides in part:

"* * * Nothing contained in this section shall be deemed to amend any such enabling act, except with respect to the manner of issuance and sale of the certificates of indebtedness as set forth herein.'

"Clearly, Article 31, § 2B does not empower the Board to vary the type of bond to be issued or the manner in which it is to be redeemed when there is a clear legislative prescription. It is only necessary to decide, then, whether the language used in the Enabling Acts is mandatory or directory.

The Respondents maintain that the phrase "shall be issued according to the serial annuity plan" which is found in Section 1 of the Enabling Acts should be interpreted as being directory only. However, the word "shall" of itself demonstrates a mandatory intent unless the context indicates otherwise. *Barnes v. State, ex rel Pinkney*, 236 Md. 564, 574, 204 A. 2d 787 (1964). We see nothing in the language of the enabling acts which would indicate that the word "shall" should be given an unusual connotation or that the Legislature meant Section 1 to have a meaning other than the meaning which it has on its face.

The Respondent relies solely upon *Hitchins v. City of Cumberland*, 215 Md. 315, 138 A. 2d 359 (1958) to support his argument that the Enabling Acts are directory only. In the *Hitchins* case the Court was asked to find a bond issue invalid because the authorizing resolution contained no definite date of sale other than the date specified in the event no referendum petition was filed. The passage whose interpretation was in dispute was as follows:

'All bonds of a municipal corporation shall

be authorized by resolution or ordinance of the legislative body of said municipal corporation which shall contain the following: * * * (3) the form of the notice soliciting bids for the purchase of said bonds which shall set forth the date, place and time for receiving and opening bids * * *.' (p. 323)

"The Court, in upholding the validity of the bond issue, refused to interpret the above passage as meaning that the resolution authorizing a bond must fix a definite date for opening of bids. Their refusal was not based, however, upon an indifference to the long-standing rule that a mandatory intent is inferred from the use of the word "shall." The Court stated at page 324 that the word "form" as used in the authorizing resolution does not connote a complete or executed document. We do not feel that the *Hitchins* case can be relied upon to overturn the long-established rule that "shall" is presumed to be mandatory and "will" directory.

We conclude, therefore, that the language of the Enabling Acts makes it mandatory upon the Board to issue bonds according to the serial annuity plan. The question remaining, then, is which, if any, of the proposed bond issues complies with the definition of serial annuity plan? The uncontradicted testimony of both Mr. O'Rourke and Mr. Nossel was that the Second Series, Third Series and Fourth Series were in accordance with the serial annuity plan and that the Fifth and Sixth Series were not.

The court finds that the Second, Third and Fourth Series of the State and Local Facilities Loan of 1969 meet the requirements of the serial annuity plan as defined by this court and are, therefore, valid, and that the Fifth and Sixth Series of the State and Local Facilities Loan of 1969 do not meet the requirements of the serial

annuity plan as defined by this court and, therefore, are invalid.

"For the reasons stated above, when presented, the court will sign a decree enjoining the sale of the State and Local Facilities Loan of 1969, Fifth and Sixth Series."

To the able opinion of Judge Evans we would add the following observation which we think fortifies his conclusion that the words "serial annuity plan," as used in the enabling acts and as found in Art. 31, § 2B were intended as *words of art* with a specific connotation. We think it significant that elsewhere in Art. 31, § 11, wherein provision is made for the creation of public debt by certain public bodies, other than the State, it is provided that the "method and time of maturing bonds" shall not be otherwise *"except upon a serial maturity plan."* The immediate query is: was a distinction meant to be observed here, where the phrase *"serial maturity plan"* is used in connection with bonds of public bodies, other than the State, instead of *"serial annuity plan,"* which latter phrase applies to bonds issued by the State? We think a distinction was intended. The difference is further emphasized by other language found in Art. 31, § 11 which provides that, "the public body may, in its discretion, provide for the maturity of said series in consecutive annual installments or at longer intervals, and the *amounts of each series may vary* but in no event shall the final series mature after the maximum period from the date of the issue of such bonds as hereinafter limited shall have expired * * *." (Emphasis supplied.) We think it was the intent of the Legislature to provide, under the terms of a "serial maturity plan," for more varying and flexible terms regarding the schedule of maturity than may be allowed under a "serial annuity plan." With the use of the latter, we think that the redemption period for principal was intended to be more than one year, as this would be in keeping with the meaning of an "annuity plan," and, as has been heretofore ex-

pressed in this opinion, the intended objective is to achieve a level debt service so as to assure uniform yearly costs to the State, in payments of interest and principal, on any particular issue. Under a "serial annuity plan" a "ballooning" of payments on principal in any one year, as is provided by the Fifth and Sixth Series, would be prohibited.

It is for the reasons set forth in this opinion that this Court filed a per curiam order on November 4, 1969 affirming the decree of the lower court.